1  Rosemary M. Rivas (State Bar No. 209147)
   rrivas@finkelsteinthompson.com
2  Tracy Tien (State Bar No. 253930)
   ttien@finkelsteinthompson.com
3
   **FINKELSTEIN THOMPSON LLP**
4  100 Bush Street, Suite 1450
   San Francisco, CA 94104
5  Telephone: (415) 398-8700
   Facsimile: (415) 398-8704
6

7

8  *Attorneys for Individual and Representative*
   *Plaintiff Ivan Goldsmith*
9

10  [Additional Counsel Listed on Signature Page]

11

12              **UNITED STATES DISTRICT COURT**

13              **CENTRAL DISTRICT OF CALIFORNIA**

14

15

16  IVAN GOLDSMITH, on behalf of          **CASE NO. 09-CV-7088 PSG (Ex)**
    himself and all others similarly situated,
17                                        **THIRD AMENDED CLASS**
18           Plaintiff,                   **ACTION COMPLAINT**

19           v.                           **DEMAND FOR JURY TRIAL**

20
    ALLERGAN, INC., a Delaware
21  Corporation,

22           Defendant.

23

24

25

26

27

28

_____
THIRD AMENDED CLASS ACTION COMPLAINT

FILED
CLERK, U.S. DISTRICT COURT

OCT 1 9 2010

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

Plaintiff Ivan Goldsmith ("Plaintiff"), on behalf of himself and all others similarly situated ("Class members"), alleges against Defendant Allergan, Inc. ("Allergan" or "Defendant") upon personal knowledge as to his own acts, and upon information and belief, including investigation of counsel, which includes interviews and discussions with medical professionals and former employees and discovery produced in the litigation, as to all other allegations, as follows:

## NATURE OF THE ACTION

1. Defendant, in furtherance of its unlawful promotional scheme surrounding its product, Botox® Cosmetic ("Botox® Cosmetic" or "the Product"), has engaged in a course of conduct that is unlawful, unfair, and fraudulent in order to increase sales to doctors.

2. Defendant is one of the dominant and controlling companies in the pharmaceutical industry. Defendant developed and orchestrated, from its headquarters in California, a promotional scheme, the purpose and effect of which was to falsely portray the permissible use of Botox® Cosmetic in order to induce Plaintiff and Class members to invest in the development of Botox® Cosmetic practices and to purchase large quantities of the Product. Specifically, Defendant's promotional scheme and business plan promoted to Plaintiff and Class members encouraged them to use one vial of Botox® Cosmetic on multiple patients, contrary to the product's label and directives from the Centers for Disease Control ("CDC") and other state medical boards and applicable medical institutions.

3. Defendant's misrepresentations and unfair conduct regarding using one vial of Botox® Cosmetic on multiple patients is twofold. First, Defendant purposefully misrepresents that one vial of the Product can be used for multiple patients and represented to Plaintiff and Class members the profits they could make based on the assumption of administering an entire vial of the Product amongst multiple patients. Second, Defendant packages the Product in excessive quantities such that an entire bottle of Botox® Cosmetic cannot be fully used

1

without violating applicable safety requirements.  This results in sales of the Product that necessarily will be wasted and overcharges to Plaintiff and Class members because they must pay for the entire contents of one Botox® Cosmetic vial but are unable to use the entire contents due to its excessive packaging and the Product's short shelf life.  The excessive packaging in turn increases Defendant's sales, revenues and profits beyond what they would be if the Product were packaged in smaller amounts more suited to single patient usage.  As the only maker of Botox® Cosmetic and through its fraudulent marketing, and unlawful and unfair conduct, Defendant caused Plaintiff and Class members to become reliant on the Product in order to recover the costs of developing their Botox® Cosmetic practices, which in turn locked them in to continued purchases of the oversized product vials long after they learned that it could not be used for multiple patients. Plaintiff's continued purchases of Botox® Cosmetic vials after learning of the single-use limitation were not voluntary, but coercive as a direct causal result of the product lock-in that was intended, encouraged and promoted by Defendant's fraudulent, unfair and unlawful marketing scheme.

4.     At all relevant times, Defendant knew that a single vial of the Product was neither intended nor permitted for use on multiple patients.  It is not possible for Plaintiff and Class Members to both administer Botox® Cosmetic in the manner instructed by Defendant while simultaneously using the Product in its permissible and intended manner.

5.     Plaintiff relied on Defendant's misrepresentations, incurring expenses for business development and unusable and unused Product.  Plaintiff's reliance on Defendant's misrepresentations was open and well known to Defendant.

## JURISDICTION AND VENUE

6.     This Court has personal jurisdiction over the parties in this case. Defendant is a Delaware corporation with headquarters in this District.

2

**THIRD AMENDED CLASS ACTION COMPLAINT**

7.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from Defendant, there are more than 100 Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

8.     Venue is proper in this District under 28 U.S.C. § 1391(a) because Defendant maintains its headquarters within this District, a substantial part of the events or misrepresentations giving rise to the claim occurred within this District, and Defendant has caused harm to Class Members residing within this District.

## **PARTIES**

9.     Plaintiff Dr. Ivan Goldsmith is a resident and citizen of Nevada and purchased and administered the Product marketed by Defendant.

10.     Defendant Allergan is a Delaware corporation with its principle place of business in Irvine, California, which is in the County of Orange.  Defendant is one of the largest pharmaceutical companies in the world.  Defendant designed, developed, manufactured, tested, marketed, promoted, distributed, and sold the Product as Botox® Cosmetic, a product designed to decrease the appearance of glabellar lines (also known as the frown lines in between the eyebrows) in persons 65 years of age and under.  In doing so, Defendant placed the Product in the stream of commerce in California and throughout the United States. Defendant has received, and will continue to receive, substantial benefits and income through its activities. Defendant authorized the actions attributed to it herein through its officers, directors, and managing agents.

//
//
//
//
//

THIRD AMENDED CLASS ACTION COMPLAINT

# FACTUAL BACKGROUND

**A.     Product History and Use**

> **i.     The Product is Approved for the Treatment of Glabellar Lines and is Packaged in 100-Unit Vials**

11.     Botulinum Toxin Type A, or onabotulinumtoximA, is a protein complex produced by the bacterium *Clostridium botulinum*, which contains the same toxin that causes food poisoning.  When used in a medical setting as an injectable form of sterile, purified botulinum toxin, small doses block the release of a chemical called acetylcholine by nerve cells that signal muscle contraction.

12.     Botulinum Toxin Type A was originally sold and marketed by Defendant under the trade name, Botox®, and packaged in 100-unit vials.  There are currently four uses approved by the Federal Drug Administration ("FDA") for Botox®: the treatment of certain eye twitches and disorders (strabismus & blepharospasm), involuntary neck muscle contractions (cervical dystonia), and excessive underarm sweating (primary axillary hyperhidrosis).  In 2010, Botox® was approved by the FDA to treat migraines.  Botulinum Toxin Type A marketed under the trade name Botox® is generally used for therapeutic purposes.

13.     In 2002, the FDA approved the use of Botulinum Toxin Type A for cosmetic purposes, specifically, the treatment of glabellar lines, also known as the wrinkles in between the eyebrows.  Although chemically identical to Botox®, Botulinum Toxin Type A for glabellar lines is sold and marketed under the trade name Botox® Cosmetic.  Botox® Cosmetic was only available in 100-unit vials until May 2008.

14.     A 100-unit vial of Botox® Cosmetic contains 100 units of vacuum-dried *Clostridium botulinum* type Aneurotoxin complex.  The complex is dissolved in a sterile sodium chloride solution containing Albumin (the main protein in

human blood) and is sterile filtered prior to filling and vacuum-drying[1].  Botox®
Cosmetic is reconstituted with sterile, non-preserved saline before injection.  Since
the complex and diluent do not contain a preservative, once it is opened and
reconstituted, Botox® Cosmetic must be stored in a refrigerator and used within
four hours.[2]

15.     Botox® Cosmetic is also marketed by Defendant for non-FDA, off-
label uses such as for the treatment of horizontal forehead lines and crows feet.

16.     Until April 2009 when the FDA approved Dysport, which is
manufactured and sold by Medicis Aesthetics (an Allergan competitor), Allergan
was the only maker of a botulinum toxin product for cosmetic use.

### ii.     The Product is Approved in a Single-Use Vial

17.     Botox® Cosmetic is, and at all times has been, FDA-approved in a
single-use vial.  "A single-use vial is a bottle of liquid medication that is given to a
patient through a needle and syringe.  Single-use vials contain only one dose of
medication and should only be used once for one patient, using a clean needle and
clean syringe."[3]  In contrast, a multi-dose vial is a bottle of liquid medication that
contains more than one dose of medication and is often used for vaccinations.[4]

18.     Defendant sends physicians a Material Safety Data Sheet for Botox®
and Botox® Cosmetic and instructs the distribution of the data sheet to employees
administering Botox® Cosmetic.  The Material Safety Data Sheet is silent on
whether a vial of the Product is single-use or multi-use.

---

[1] RxList, http://www.rxlist.com/botox-drug.htm (last visited Oct. 19, 2010).

[2] *Id.*

[3] Centers for Disease Control and Prevention, A Patient Safety Threat - Syringe
Reuse, http://www.cdc.gov/injectionsafety/patients/syringeReuse_faqs.html  (last
visited Oct. 19, 2010).

[4] *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT

19.     The Botox® Cosmetic vial label, carton, and package insert have gone through several iterations since the Product was FDA-approved in 2002.  Not all iterations of the Botox® Cosmetic vial label have stated that the product was for single-use.

20.     An unopened vial of Botox® Cosmetic may be stored in the refrigerator for up to 36 months for the 100-unit vial or up to 24 months for the 50-unit vial.

21.     An open, reconstituted vial of Botox® Cosmetic must be used within four (4) hours of reconstitution.

22.     The Product includes a lengthy package insert.  Buried within the Product's description and indication language is the following language in small print but reproduced in larger print here:

> Do not exceed the recommended dosage and frequency of **BOTOX® Cosmetic.**  Risks resulting from administration at higher dosages are not known.
>
> . . .
>
> **PRECAUTIONS**
> *General:*
> The safe and effective use of **Botox® Cosmetic** depends upon proper storage of the product, selection of the correct dose, and proper reconstitution and administration techniques.
>
> . . .
>
> **HOW SUPPLIED:**
> **Botox® Cosmetic** is supplied in a single patient use vial in the following sizes.
>
>> 50 Units: NDC 0023-9232-50
>>
>> 100 Units: NDC 0023-9232-01
>
> **Single-use vial.**

6

23.     Allergan management tells its sales representatives (known as Business Development Managers or "BDMs") that it is not necessary to leave the Botox® Cosmetic package insert at every physician's office they visit.

### iii. The Centers for Disease Control and Prevention and State Medical Boards Warns Against Multiple Uses of a Single-Use Vial

24.     Cosmetic treatments do not require 50 or 100 units of the Product. For instance, the recommended dosage for the treatment of glabellar lines is 20 units.  So if a patient needs only 20 units, the remaining 80 units (of a 100-unit vial) must be discarded.

25.     The CDC warns against multiple uses of a single-use vial.[5]  Like the CDC, several state health departments including the California Department of Public Health, the Nevada State Health Division, the New York State Department of Health, and the Oklahoma State Department of Health also warn against the multiple use of a single-use vial.

26.     The CDC warns against multiple uses of a medication vial and the dangers of contamination.[6]

27.     The CDC warns that practices that have resulted in transmission of hepatitis C virus (HCV) and/or hepatitis B virus (HBV) include "using the same

---

[5] Centers for Disease Control and Prevention, Standard Precautions, http://www.cdc.gov/ncidod/dhqp/gl_isolation_standard.html (last visited Dec. 3, 2009); Jane D. Siegel et al., *2007 Guideline for Isolation Precautions: Preventing Transmission of Infectious Agents in Healthcare Settings*, http://www.cdc.gov/hicpac/pdf/isolation/Isolation2007.pdf (last visited Oct. 19, 2010)

[6] Centers for Disease Control and Prevention, FAQs for Providers, http://www.cdc.gov/injectionsafety/providers/provider_faqs.html (last visited Oct. 19, 2009).

THIRD AMENDED CLASS ACTION COMPLAINT

1  medication vial for more than one patient, and accessing the vial with a syringe

2  that has already been used to administer medication to a patient."[7]

3       28.    The CDC provides, "Medication vials that are labeled for single-use

4  and pre-filled medication syringes should never be used for more than one

5  patient."[8]

6       29.    In response to the question, "Is it acceptable to leave a needle or other

7  device inserted in the septum of a medication vial for multiple medication draws?"

8  the CDC provides, "NO. A needle or other device should never be left inserted into

9  a medication vial septum for multiple uses.  This provides a direct route for

10  microorganisms to enter the vial and contaminate the fluid."[9]

11       30.    The CDC also states that "It is a well established practice to never use

12  the same syringe or needle for more than one patient nor to enter a medication vial

13  with a syringe or needle used for one patient if the same vial might be used for

14  another patient."[10]

15       31.    These stringent requirements regarding proper use of a single-use vial

16  are important because "Pathogens including HCV, HBV, and human

17  immunodeficiency virus (HIV) can be present in sufficient quantities to produce

18  infection in the absence of visible blood.  Similarly, bacteria and other microbes

19  can be present without clouding or other visible evidence of contamination.  Just

20  because you don't see blood or other material in a used syringe or IV tubing does

21  not mean the item is free from potentially infectious agents."[11]

22

23  [7] *Id.*

24  [8] *Id.*

25  [9] *Id.*

26

27  [10] *Id.*

28  [11] *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT

32.     The CDC's August 27, 2001 Morbidity and Mortality Weekly Report ("MMWR") stated, "[o]nce a needle has entered a vial labeled for single use, the sterility of the product can no longer be guaranteed.  Residual medication from two or more vials should not be pooled into a single vial."[12]

33.     After hepatitis outbreaks during 2000-2002, in a September 26, 2003 MMWR, the CDC again warned, "[d]o not administer medications from single-dose vials or combine leftovers for later use."[13]

34.     In February 2008, the Nevada State Health Division issued a technical bulletin directing physicians to adhere to "fundamental principles related to safe injection practices."  Specifically, the Nevada State Health Division stated that single-use medication vials should not be used for multiple patients and leftover medication from single-use vials should not be combined for later use.

35.     In March 2008, the California Department of Public Health issued a letter to healthcare facilities warning them against using single-use vials for multiple patients.  The letter stated that injection practices should be consistent with CDC standards, which require that single-use vials never be used for multiple patients.

36.     In the summer of 2008, the Oklahoma State Department of Health also issued an "Epidemiology Bulletin" warning medical practitioners against using single-use vials for multiple patients.

//

---

[12] Centers for Disease Control and Prevention, *Recommendations for Preventing Transmission of Infections Among Chronic Hemodialysis Patients*, Apr. 27, 2001, *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/rr5005a1.htm

[13] Centers for Disease Control and Prevention, *Transmission of Hepatitis B and C Viruses in Outpatient Settings --- New York, Oklahoma, and Nebraska, 2000—2002*, MMWR 2003; 52(38):901-906; Sept. 26, 2003, *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm5238a1.htm

THIRD AMENDED CLASS ACTION COMPLAINT

### iv.   Hepatitis Exposure in Nevada Causes Defendant to Package the Product in 50-Unit Vials

37.    In February 2008, the Southern Nevada Health Department notified over 40,000 Nevada residents about a potential exposure to hepatitis from multiple uses of Propofol, another drug product approved for single-use administration but often promoted and used in multiple procedures.  A number of residents did indeed contract hepatitis.

38.    After the hepatitis outbreak, the Nevada State Medical Board sent a letter to Plaintiff and other physicians instructing them that one vial of Botox® Cosmetic should only be used on one patient.

39.    In March 2008, the Compliance Alliance, a firm which addresses healthcare compliance issues in Nevada, Arizona, and California, sent a letter to Defendant specifically noting that Botox® Cosmetic was being extensively used as "multi-dose" vials.  The Compliance Alliance noted that many physicians' practices had closed down and licenses were suspended due to using medications labeled "single-use" for multi-use purposes.  The Compliance Alliance advised Defendant to package the Product in smaller vials, such as 30-unit vials.

40.    Because of the controversy, only then did Defendant begin packaging Botox® Cosmetic in smaller unit vials.  In May 2008, Defendant began packaging Botox in 50-unit vials.  These 50-unit vials were initially introduced in limited numbers.  However, at $298 a vial, a 50-unit vial is sold at a much higher price than 50% of a 100-unit vial (at $525).

## B.   Defendant Misrepresents the Use of Botox® Cosmetic and Promotes a Misleading, Unfair, and Unlawful Business Model From Its Headquarters in California

41.    A month after the FDA's approval of Botox® Cosmetic to treat glabellar lines in 2002, Defendant, stressing the importance of marketing to physicians, launched a $50 million advertising campaign.  The campaign had two

1    components: (1) targeting consumers through television and print ads in women's

2    magazines, patient brochures, and in-office materials; and (2) targeting physicians

3    with Botox® Cosmetic business development opportunities and training.

4        42.    First, Defendant urged women to use Botox® Cosmetic.  The New

5    York Times reported that "Allergan officials expect Botox sales, which include

6    medical and cosmetic drug sales, could jump by nearly 35 percent this year,

7    generating $420 million for the company, [Allergan spokesperson] Ms. Cassiano

8    said.  About one-third of sales stem from Botox cosmetics.  The drug company has

9    committed $50 million to an advertising campaign[] and local doctors and spa

10   owners said they had already noted an increase in Botox inquiries."[14]

11       43.    An article discussing the FDA approval of Botox® Cosmetic stated

12   that despite the publicity and increase in Botox® Cosmetic sales, it was "not

13   enough to satisfy Allergan executives."  Tom Albright, Allergan's head of

14   marketing, stated, "word of mouth didn't spread everywhere."  The article states,

15   "[a]lthough high-glam places like New York, Los Angeles, and Miami took to

16   Botox early on, Albright argues that doctors and patients in much of the nation's

17   midsection still need enlightenment.  He says that only 1% of Allergan's target

18   audience of 5.5 million 'aesthetically oriented people' (essentially, prosperous

19   middle-aged women who have already visited a dermatologist) have used Botox

20   for wrinkles."[15]

21       44.    The Orange County Register reported in 2007 that only three percent

22   of women who could afford Botox injections actually got them.  It became

23

24   [14] Kathleen Kiley, *A New Face on the Party Scene: Botox,* N.Y. Times, June 23, 2002*, available at* http://www.nytimes.com/2002/06/23/nyregion/a-new-face-on-the-party-scene-botox.html.

26   [15] Brian O'Reilly, *Facelift in a Bottle Allergan, the drug company that makes Botox, has a fresh glow*, CNNMoney.com, June 24, 2002, *available at* http://money.cnn.com/magazines/fortune/fortune_archive/2002/06/24/325166/index.htm.

THIRD AMENDED CLASS ACTION COMPLAINT

1    Defendant's resolve to persuade the remaining ninety-seven percent of women that
2    "they're missing out on a good thing."  The company conducted research through
3    consumer surveys and found that aside from safety issues, "the real issue was that
4    people didn't want a frozen face."  Defendant later launched a "Freedom of
5    Expression" ad campaign. The campaign spotlighted *Sideways* actress Virginia
6    Madsen, who discussed her own use of Botox® Cosmetic and her ability to convey
7    emotions.  BrandWeek dedicated an article on the campaign in July 2008.  The
8    campaign, reportedly managed by Grey Healthcare Group, included fifteen and
9    thirty second spots on cable channels such as Lifetime, TNT, HGTV and TLC; and
10   network TV including The Today Show, The View and Good Morning America.
11   Print ads were also displayed in twenty national magazines.  Web banners were
12   posted on the sites of many of the broadcast outlets and magazines.  The campaign
13   also included public service announcements such as an event with Allergan,
14   Madsen, and the League of Women Voters encouraging people to vote and
15   presumably, consider Botox.  It was estimated that Defendant spent $41 million in
16   2007 on ads for Botox® Cosmetic, excluding online ads.

17        45.    Because the wholesale cost of Botox® Cosmetic is so high
18   (approximately $525 for a 100-unit vial and $298 for a 50-unit vial) and cosmetic
19   procedures do not require 50 or 100 units of Botox® Cosmetic, Defendant created
20   a marketing campaign from its corporate headquarters in California which
21   promoted multi-use of a single vial as a primary means of effectuating the purchase
22   by Plaintiff and the Class.

23                    **i.    Defendant Misrepresents that One Vial of Botox®**
24                    **Cosmetic May be Used for More than One Patient**

25        46.    Second, Defendant marketed Botox® Cosmetic to medical
26   professionals.  Defendant, through its sales representatives who were trained,
27   supervised and directed from the Defendant's Irvine, California headquarters, told
28   Plaintiff and Class members that one vial of Botox® Cosmetic could be used for

1   multiple patients and instructed Plaintiff and Class members on how to inject

2   multiple patients using one vial of the Product.

3       47.    Based upon sources including but not limited to news stories, journal

4   articles, and interviews with medical professionals, Defendant's misrepresentations

5   concerning the multi-use of Botox vials have been ongoing and continuous since

6   the Product's inception in 2002.  Moreover, given the CDC warnings and medical

7   board regulations, Defendant knew, since the Product's inception, that its

8   marketing of the Product was contrary to established health precautions.

9       48.    Defendant's marketing to Plaintiff and Class members is conducted

10   primarily through in-office visits by Allergan BDMs.

11       49.    Immediately after the Product was approved in 2002, Defendant

12   targeted physicians with training options.  Starting in 2002, Defendant's wrongful

13   promotional efforts included providing, through its sales representatives,

14   complimentary staff vials.  Defendant's representatives bring "staff vials" of the

15   Product to a physician's office, instruct the office on how to reconstitute the

16   Product, line up the office's employees, and instruct injectors where and how to

17   inject the Product.  During these sessions, Defendant's representatives direct that

18   one vial of Botox® Cosmetic be used on multiple people.  In fact, during these

19   presentations, under the supervision of Allergan representatives, the contents of

20   one vial of Botox® Cosmetic would be injected into multiple people.

21       50.    Defendant also holds training sessions for its sales representatives

22   where multiple Allergan representatives are injected with Botox® Cosmetic from

23   the same bottle.  Defendant's sales representatives are then told that this is how

24   they should market the product to physicians.

25       51.    Defendant, through its representatives, recommends that physicians

26   encourage customers to use the "buddy system," where two or more patients come

27   in to the office together to share a single vial.  For that reason, Defendant also

28

THIRD AMENDED CLASS ACTION COMPLAINT

1    suggests specific procedure days where patients can be scheduled in a manner to

2    effectively use the vials to avoid spoilage.

3        52.    Even before Plaintiff first purchased Botox® Cosmetic in 2005,

4    Defendant's representative, Jenny Jones would visit Plaintiff's offices to promote

5    the Product.

6        53.    BDMs supporting Allergan Facial Aesthetics visited Plaintiff.  These

7    BDMs included, but are not limited to, Tina Damore and Jenny Jones.  On multiple

8    occasions, Plaintiff saw Defendant's representatives, including but not limited to,

9    Jenny Jones, Tina Damore, Mary Bryant, and other training representatives

10   including some representatives from Phoenix and San Diego demonstrate that

11   Botox® Cosmetic could be injected from one vial and used on multiple patients.

12   Jenny Jones would visit Plaintiff approximately weekly upon the grand openings of

13   his new facilities, and then on average, one to two times per month.

14       54.    Plaintiff is aware of countless instances of misleading promotion, both

15   publicly and privately, by Defendant through its representatives.[16] References to

16   "Botox parties" using a single 100-unit vial across numerous "party" attendees

17   were included in continuing medical education ("CME") programs and other

18   promotional forums hosted, funded, or promoted by Defendant beginning with the

19   product's introduction in 2002.  Defendant, through its representatives, promoted

20   and attended physician administered "Botox parties" where multi-patient use of a

21   single vial was encouraged and also provided merchandise and food for the party

22   attendees.

23   _____

24   [16] Although this complaint alleges that Defendant made representations that

25   constituted more than mere off-label promotion, Defendant has admitted that it

26   promotes off label uses of Allergan products through its representatives and that

     such promotion is in violation of FDA regulations. *See Allergan, Inc. v. United*

27   *States*, No. 2009 CV 01879 (D.D.C. filed October 1, 2009) (complaint asserting

28   First Amended rights to free speech).

55.     In addition, Defendant, through its representatives, affirmatively told or informed at least one practitioner that Allergan could write a letter stating that multiple use of one Botox® Cosmetic vial was acceptable.

### Botox Parties

56.     From the inception of the Product in 2002, Allergan marketed the concept of "Botox Parties" to medical professionals as a promotional tool to increase the sales of its Product and to increase potential end-user awareness of Botox® Cosmetic.  Allergan not only promoted the Botox party marketing concept, but also provided material support for these Botox parties, including marketing materials, freebies for attendees, catering, the attendance of an Allergan representative at the party, and samples of the Product.

57.     In February 2002, the Palms Casino in Las Vegas announced that it would host "Botox Cocktail Parties" two Saturdays every month, in which a renowned Beverly Hills-based plastic surgeon would inject patients in a spa setting.

58.     In an article dated August 4, 2002, reporter Caroline Zinko discussed Botox parties occurring in San Francisco, California and around the country. "Botox parties are sweeping the nation now that botolinum toxin has been approved as a cosmetic aid by the Food and Drug Administration."[17]

59.     Botox parties became ubiquitous.  These parties, where patients were offered discounts, food and other freebies, allowed Defendant to quickly sell Botox® Cosmetic.  Patients could receive discounts on treatments, physicians could drum up business, and in turn, Defendant could sell more Product.

---

[17] *See* e.g. Carolyne Zinko, *The BOTOX BUFFET / Demand for anti-wrinkle drug has turned procedure into social occasion*, SFGate.com, August 4, 2002, *available at* http://articles.sfgate.com/2002-08-04/living/17556427_1_botox-party-patient-safety-dermatology.

60.     On July 9, 2002, Public Citizen's Health Research Group sent a letter to Johns Hopkins School of Medicine requesting that the school cancel its "Botox Night."  The letter acknowledged that "a vial of the very expensive Botox typically contains enough toxin for five injections; because the contents are intended to be discarded within four hours of the vial being opened, there is an incentive to use all the contents rapidly.  The procedure must be repeated every three to six months, potentially providing a steady stream of patients (and income)."[18]

61.     The Public Citizen's Health Research Group letter also stated, "Shortly after Botox was approved for cosmetic uses, the American Academy of Dermatology went on record criticizing Botox parties.  In an April 29, 2002, letter to all Academy members, Dr. Fred F. Castrow II, the Academy's president, stated that 'Social gatherings of this kind in combination with botulinum toxin treatments are inappropriate and potentially dangerous settings for patients.  As such, I strongly discourage you from participating in these kinds of medical/social activities.'"[19]

62.     An article discussing expert warnings against Botox parties stated, "Botox parties . . .  appear to represent a nifty solution to an often-frustrating problem with Botox's packaging: the substance is sold in vials containing 100 units, which is enough for about five treatments.  Once open and mixed, however, the Botox must be used within four hours, according to specifications by its maker, Allergan.  At about $400 per vial, doctors better make sure they've got more than

---

[18] http://www.citizen.org/publications/publicationredirect.cfm?ID=7183 (last visited Oct. 19, 2010).

[19] *Id.*

1   one patient lined up."[20]  According to one doctor in this article, any unused

2   Botox® Cosmetic has to be discarded.

3       63.    In an article discussing Botox parties, dated December 1, 2002,

4   Defendant's manager of public affairs, Christine Cassiano was quoted, "(Botox

5   Cosmetic) is sold in a 100-unit vial" and ". . . per vial, it (the dosage) is dependent

6   on the patient and the indication for which it is being used.  When used for treating

7   brow furrow, the dosage is approximately 20 units.  So 20 units would be

8   necessary for the five injections of four units each."  Moreover, "For sterility

9   purposes, it should be used within four hours of being reconstituted."  The article

10   notes that "the economics behind paying for a vial that will potentially treat five,

11   rather than just one patient with the average 20-unit dosage, have led some to

12   create 'botox parties.'"[21]

13       64.    In a 2002 article, Allergan CEO, David E.I. Pyott stated, "Botox is

14   elective.  We want the experience to be marvelous.  Like going to an expensive

15   restaurant.  If it's bad, you won't go back."[22]

16       65.    "[I]n addition to training doctors to inject Botox, Allergan is teaching

17   them to design and decorate their offices to appeal to patients who want to be

18   pampered. A new class of medicine men -- 'Botox cosmetic development

19

20

21

22   [20] Experts Frown on Botox Parties, http://www.botox-cosmetic-
     surgery.com/news_botox_experts_frown_botox_parties.htm (last visited Oct. 19,
23   2010).

24   [21] Kelli M. Donley, *Beauty by Injection: Following the Botox Craze*,
25   Surgistrategies.com, Dec. 1, 2002, *available at*
     http://www.surgistrategies.com/articles/2002/12/beauty-by-injection-following-
26   the-botox-craze.aspx.

27   [22] O'Reilly, *supra*.

28

17
THIRD AMENDED CLASS ACTION COMPLAINT

1   managers'-- will tell doctors what women really want while they are being

2   inoculated against wrinkles."[23]

3       66.     Defendant urged Plaintiff and Class Members to host these "Botox

4   parties."  Plaintiff was told by his Allergan representative to "utilize the resources

5   of your Allergan Rep – to support you with <u>printing</u> for your event mailers,

6   <u>catering</u> for your events/patients educational seminars, and to provide any

7   Botox/juvederm give-a-aways [*sic*] or goodie bags for these events."  *See* Exh. A.

8       67.     Defendant has its own internal printing vendor where its sales

9   representatives can customize posters, brochures, mailers, etc. for the individual

10  physician.  Defendant's representatives provide these printing pieces free of charge

11  to the physician.  Defendant also allows its sales representatives to expense

12  thousands of dollars a month to utilize an Allergan-approved vendor to print these

13  promotional materials.  These promotional pieces were not FDA-approved and

14  Defendant would provide sample content including the price of Botox® Cosmetic

15  by the unit.  Not only did Defendant urge physicians to host these Botox parties,

16  but it knew exactly how these events were being promoted.

17      68.     In 2008, Plaintiff attended a Botox party at the Rampart Casino with

18  one of his staff members where Allergan-retained nurse Mary Bryant trained

19  doctors using the multi-use technique.

20      69.     In January 2008, pursuant to Defendant's encouragement, Plaintiff

21  hosted a Botox party at the grand opening of his Anthem Trimcare clinic in

22  Henderson, Nevada.  Defendant's representative, Jenny Jones, attended the party

23  and also provided supplies for and promoted the party.

24      70.     Even today, Defendant continues to promote Botox parties.  For

25  example, on the social networking site Facebook, Arrowhead Dermatology

26  Cosmetics' Facebook page touts their Botox parties and tells potential patients that

27

28  [23] *Id.*

Allergan representatives will be present to help them and sign them up for awards programs.[24]

### **Patient Incentive Programs**

71.   Since 2002, Defendant, through its representatives, advised Plaintiff and Class members that patients "prefer a Botox price by the unit" as opposed to per vial.  *See* Exh. A.  Allergan sponsored injector training sessions included guidance on how to build an aesthetic practice with Botox® Cosmetic.  Training attendees were told that they should charge patients by the unit or by the area to be treated.

72.   Defendant never told doctors to price the Product by the vial.

73.   The fact that Allergan promoted to Doctors that they charge their patients by the unit and not by the vial is another indicator that Allergan knew and promoted that one vial be used for more than one patient.  If one patient requires 20 units of the Product and another patient only requires 15 units of the Product, it would be economically inefficient, from a doctor's perspective, to charge them different prices if the remaining contents of each of their 100 unit vials were going to be discarded.  Per unit pricing *only* makes economic sense if there is multi-patient use of Botox vials.

74.   At Botox® Cosmetic training seminars, physicians were told that after the injection training, whatever Botox® Cosmetic they had remaining in the vial, they were free to take back to their offices.

75.   Defendant, through its representatives, also advised Plaintiff and Class members that they should provide incentives to ensure patient return.  In May 2005, Defendant launched its "Botox® Cosmetic Benefits" program – a patient

---

[24] Arrowhead Dermatology's Facebook Page, http://www.facebook.com/pages/Peoria-AZ/Arrowhead-Dermatology-Cosmetics/332808417912 (last visited Oct. 19. 2010).

"loyalty" program which was designed to incentivize patients to return for treatments, create word-of-mouth buzz, and remain loyal to his or her treating physician.  Pursuant to the program, patients receive a "debit" card upon their first treatment.  For every subsequent treatment, patients accrue rewards that may only be redeemed at the same physician's office.

76.   In 2006, Defendant updated its Botox® Cosmetic Benefits program.  When a patient swipes his or her program card, the office staff types in the unique vial code to authorize the transaction.  The vial code for one vial of Botox® Cosmetic may be entered up to five times before the code is deactivated.  Thus, Defendant knows, facilitates, and promotes that one vial of Botox® Cosmetic be used five times to treat multiple patients.

77.   Defendant also recommends a "Botox Express Card," where a patient earns a stamp for every ten units of Botox® Cosmetic purchased.  After ten stamps, the patient receives ten units for free.  *See* Exh. B.  If patients are paying for Botox® Cosmetic treatments in ten-unit increments, this furthers Defendant's representations to physicians that patients prefer paying for the Product by the unit.  It is also further evidence that not only did Defendant know doctors were using single vials for multiple patients, but that Defendant promoted this use through the structure of its incentive and marketing programs.  Again, pricing Botox by the unit makes no economic sense from a doctor's perspective if each vial is used solely for a single patient.  This promotion was another manner in which Defendant misrepresented that a single-use vial should be used on multiple patients and that doctors could build a profitable Botox® Cosmetic practice.

78.   Defendant offered these express cards directly through a flyer to Plaintiff's patients.

79.   Furthering a "per unit" instead of a "per vial" practice, Defendant also recommends that doctors offer discounts to patients, such as a $100 discount if the patient purchases 20 units of Botox® Cosmetic along with one syringe of

1    Juvéderm, a wrinkle filler often used in conjunction with Botox® Cosmetic

2    treatments.  *See* Exh. C.

3                    **Botox Calculators and Sales Analysis Tools**

4            80.    Defendant created, and through its representatives, provided Plaintiff

5    and Class members with a "Botox calculator" and "business plan worksheet" to aid

6    them in estimating their "personalized projections regarding your injectable

7    business."  The estimated profit to Plaintiff and Class members is calculated based

8    on administering an entire vial of Botox® Cosmetic—an impossible feat for

9    single-use treatment.  *See* Exh. D.

10           81.    For example, in 2008, Defendant estimated that a patient's price for

11   the Product was $9 a unit.  Based on this estimate and the wholesale cost of $525

12   for a 100-unit vial of Botox® Cosmetic, Defendant told Plaintiff and the Class that

13   the profit per vial would be $375.  *See* Exh. D,

14           82.    Moreover, Defendant, through its representatives, requires Plaintiff

15   and Class members to fill out an Account Analysis Form.  Again emphasizing that

16   Defendant promoted that a per unit charge is preferable, the Form inquires as to the

17   office's "average Botox® Cosmetic price **per unit.**"  *See* Exh. E (emphasis in

18   original).

19    **Continuing Medical Education Courses and Allergan-Sponsored Events**

20           83.    CME courses sponsored by Defendant were often provided by

21   Aesthetic Health Dimensions, a CME company to which Allergan donates money

22   for injector trainings.  Defendant is aware of and promotes these CME courses

23   because they "are able to teach all techniques (outside of the FDA-approved

24   glabellar line treatment for Botox)[.]"  *See* Exh. F

25           84.    Through educational grants, Defendant sponsored numerous training

26   programs in California for both local and out-of-town participants.  Participants in

27   these training sessions were taught how to administer Botox® Cosmetic using

28   Defendant's multi-use method.

85.     Plaintiff's staff members attended CME courses and reported back to him.

86.     Plaintiff also attended several seminars and CMEs, including a Facial Aesthetics Conference and Anti-Aging Shows.  Plaintiff also attended online CME classes through the Internet.  This has occurred since 2006 to the present.

87.     Defendant also sponsored and hosted dinners and events in cities all over the United States in order to court physicians and practitioners to persuade them to buy Allergan products, such as Botox® Cosmetic.  These dinners and events frequently included guest speakers such as doctors flown out from California who promoted Botox® Cosmetic and other cosmetic procedures and who promoted the multi-use model for Botox® Cosmetic vials.  *See* Exh. F.

88.     Defendant instructs its sales representatives to participate in the organization of these events, to sign-up as many attendees as possible, and to offer free samples of the Product at these events as further incentive for attendance.

89.     Plaintiff's Allergan representative invited him to many of these dinners and events.  *See* Exh. F.  At the events Plaintiff attended, presenters used one vial of Botox® Cosmetic on multiple patients.

90.     Defendant's California-based representatives frequently flew out to Nevada and other states to promote and sell Allergan products, such as Botox® Cosmetic.

91.     Defendant also has direct relationships with consulting firms that aid physicians in building a cosmetic practice.  These agents also promote multi-patient use of single-use Botox® Cosmetic vials.

92.     In short, Defendant developed an aggressive marketing program that encouraged medical professionals to use Botox® Cosmetic single-use vials for multi-use.  Through its marketing materials to medical professionals and the manner in which Defendant packaged the Product, Defendant represented that a single-use vial of the Product was suitable for multiple procedures and multiple

22

THIRD AMENDED CLASS ACTION COMPLAINT

1   patients, when in fact, the Product is not suitable for multiple procedures and

2   multiple patients.

3        93.    Defendant's aggressive marketing of the Product to Plaintiff and Class

4   members and its representations regarding multiple uses of a single-use vial of

5   Botox® Cosmetic induced Plaintiff and Class members to purchase the Product

6   with the belief that their using the Product in the manner promoted by Defendant

7   was appropriate.

8        94.    Defendant's promoted business model, the "Botox calculator," and

9   other promotional programs described herein, created the expectation in Plaintiff

10  and Class members that one vial of Botox® Cosmetic could be used in its entirety.

11  It created the expectation that a valid business model could be utilized by Plaintiff

12  and the Class to create a profitable Botox® Cosmetic practice.  Defendant

13  purposefully and intentionally induced Plaintiff to purchase the Product by

14  indicating that Plaintiff could use a single-use vial of the Product for multiple

15  procedures and multiple patients.

16       95.    Although the Product's label states that it is for single-use (in fine

17  print), it is clear that Allergan's contrary representations and aggressive marketing

18  caused physicians to think otherwise.  Indeed, Defendant affirmatively told at least

19  one practitioner that Allergan could provide them with a letter telling them that

20  multi-use was allowed.   Moreover, Allergan clearly packaged and priced the

21  Product in such a manner that single-use would have been uneconomical.

22       96.    Allergan's representations, promotional programs, and product

23  packaging were misleading and/or untrue because they created the expectation that

24  one vial could be used for multiple patients.  Allergan had a duty to clearly and

25  conspicuously disclose the dangers of multi-use to physicians and the public.

26  However, everything Allergan did – from Botox parties, to office consultations,

27  and to meetings with doctors – encouraged multi-use.

28

97.     Defendant knew that it would not have sold as much of its Product to Plaintiff and Class members if Defendant had properly represented the Product and made adequate disclosures.  When state epidemiologist for the Nevada State Health Division, Dr. Ihsan Azzam, raised concerns that a single-use vial should not be used on multiple patients, "Botox providers told him it would not be possible to make a profit if the injection practices he supported were followed."  Indeed, "Allergan [would] have to step up to the plate and make different quantities of the drug.  It may cost [Allergan] a little more."

98.     Physicians and providers of Botox® Cosmetic contacted by the Las Vegas Review Journal "said that Allergan's sales representatives have consistently said vials of Botox could be used for multiple patients."  One person stated, "no matter what training seminar or continuing medical education course I went to, the Allergan people always said a vial was for multiuse."  Doctors who attended Defendant's seminars stated that "Allergan seminars have demonstrated multiple patient use of the product for years."  In the same article, although Allergan spokeswoman Kellie Reagan stated that the vial label said it was for single-use, she would not comment on how Defendant's sales representatives promote the Product's use.

### ii.     Plaintiff and Class Members Were Unaware of the Product's Single Use Indication

99.     Plaintiff was unaware of Botox® Cosmetic's single-use indication until Spring 2008 when it was called to his attention by another Nevada physician. Subsequently, Plaintiff contacted several other physicians who were also admittedly unaware of the single-use indication for Botox® Cosmetic vials.  *See* Exh. G.

100.    Although the Product package may state "single use" in the fine print, Defendant's aggressive marketing and affirmative statements that the Product could be used for multiple patients caused practitioners to think that multiple use

24

1   was appropriate.  Any "warning" provided by Defendant's label was clearly

2   inadequate.

3       101.   In fact, Defendant's own sales representatives were also not told that

4   one Botox® Cosmetic vial could not be used on more than one patient.  Defendant

5   did not provide this information to its sales representatives or require them to

6   inform doctors.  Defendant's own training materials do not advise sales

7   representatives that one Botox® Cosmetic vial is not to be used for multiple

8   patients.

9       102.   Defendant knew that doctors had been unaware of the Product's

10  single-use directive because after the hepatitis outbreak in 2008, Defendant

11  received inquiries from doctors and doctors' offices across the country requesting

12  information about whether one vial could be used on multiple people.  Even after

13  being confronted with these inquiries, Defendant, through a representative,

14  affirmatively told or informed at least one practitioner that Allergan could write a

15  letter stating that multiple use of one Botox® Cosmetic vial was acceptable.

16      103.   Even after the Nevada hepatitis outbreak and upon receiving inquiries

17  from doctors, Defendant still would not affirmatively tell doctors not to service

18  multiple patients with one Botox® Cosmetic vial.  In addition, Defendant refused

19  to issue any clarification regarding the allowable use of the Product versus the use

20  indicated by the vial.

21      104.   Such confusion amongst medical practitioners is not uncommon.

22  Despite approximately 125,000 patients being notified of exposure to diseases due

23  to injection practices since 1999, just recently in 2010, the CDC and the Safe

24  Injection Practices Coalition launched the "One & Only Campaign," a public

25  health campaign raising awareness amongst healthcare providers and patients

26  regarding safe injection practices.  The Safe Injection Practices Coalition began

27  pilot programs in Nevada and New York.

28

105.   The New York State Health Commissioner recently urged health professionals to watch a safe injection training video supplied by the national Safe Injection Practices Coalition.  The video "dispel[s] common misconceptions – such as the belief that it is safe to administer medication from single-dose vials to multiple patients . . ."[25]

### iii.   Defendant's Packaging and Pricing of the Product is Unfair because it Results in Overcharges to Plaintiff and Class Members who Administer the Product in Compliance with Safety Standards and Requirements

106.   From 2002 when Botox® Cosmetic was first approved by the FDA to May 2008, Defendant only packaged Botox® Cosmetic in 100-unit vials.  However, cosmetic treatments for a single patient do not require 100 units of the Product.  For example, the FDA has only approved the Product for treatment glabellar lines in a 20 unit dose.  According to Defendant's own instructions, once the Product is reconstituted, it must be used within four hours.  The excessive packaging coupled with the Product's short shelf life means that one vial of the Product cannot be fully-used for one patient.

107.   Although Plaintiff and Class members paid for the use of 100 units of Botox® Cosmetic, they were unable to use the entire vial on a single patient due the fact that most cosmetic treatments do not require 100 units and the short shelf life.  The majority of procedures for which Plaintiff purchased the Product required only 20 units of the Product, thus leaving 80 units (80%) of the Product wasted unless the vial was used for multiple patients.

108.   Only after the hepatitis exposure in Nevada did Defendant began packaging and selling the Product in 50-unit vials.  This did not solve the problem,

---

[25] NYS Health Commissioner Urges Health Care Providers to View New Safe Injection Practices Training Video, http://www.health.state.ny.us/press/releases/2010/2010-05-26_safe_injection.htm (last visited Oct. 19, 2010)

THIRD AMENDED CLASS ACTION COMPLAINT

1    however, because the pricing of the vials still encourages multi-use.  A 50-unit vial

2    is still, in most cases, inappropriate for single-use and the 50-unit vial is priced

3    much higher on a per-unit basis than the 100-unit vial.  Moreover, 50-unit vials

4    were sold in limited quantities.  *See* Exh. H.

5      109.   Defendant presently continues to encourage multi-use of the Product

6    by the way it packages and the manner in which it sets its pricing.  Defendant sells

7    100-unit vials of Botox® Cosmetic for approximately $525.  In contrast, a 50-unit

8    vial costs more per unit, at approximately $298 per vial.  Thus, a 50-unit vial costs

9    more per unit, encouraging the purchase of 100-unit vials and multi-use.

10      110.   The manner in which Allergan promotes, represents, packages, and

11    prices the Product violates CDC and state medical requirements prohibiting using a

12    single-use vial on multiple patients.[26]

13      111.   Defendant's actions also violate federal laws prohibiting advertising

14    or representations of off-label usage of drugs and the misbranding of drugs.  (21

15    C.F.R. §§, 201.100, 201.128, 202.1; 21 U.S.C. §§ 331 *et seq.*, 352 *et seq.*).

16      112.   Due to Defendant's representations and packaging of the Product,

17    Plaintiff was overcharged for the Product.  Plaintiff was forced to discard the

18    remaining and unnecessarily purchased units of the Product.  Additionally, the

19    remaining Product's approved shelf life is such that, according to Defendant's

20    instructions, the Product must be used within roughly four (4) hours.  Because

21    subsequent dosages for a procedure occur well after this time limit (one glabellar

22    line treatment lasts three to four months), this precludes Plaintiff from using the

23    Product on the same patient for repeated procedures as the Product, according to

24    Defendant, is no longer safe, effective, or approved for such use.

25

26    [26] *See, e.g.*, Centers for Disease Control and Prevention, FAQs for Providers,

27    http://www.cdc.gov/injectionsafety/providers/provider_faqs.html#11 ("Medication

28    vials that are labeled for single-use and pre-filled medication syringes should never

be used for more than one patient") (last visited Oct. 19, 2009).

113.   As a result of Defendant's conduct, Plaintiff and the proposed Class lost profits in the form of the unusable and discarded liquid and/or lost money in the purchase price of the unusable and discarded liquid.

### iv.   Plaintiff's Continued Purchase of Botox® Cosmetic After 2008 Was Not Voluntary

114.   Plaintiff, upon learning of, and abiding by, the single-use restriction, has suffered a significant reduction in profits.  In addition, putative Class members have lost business and profits in having to turn away patients who refuse to purchase an entire vial of Botox® Cosmetic.  In fact, Plaintiff and Class members who devoted a significant portion of their practice to Botox® Cosmetic based on the multi-use business model promoted by Defendant suffer significant financial hardships, bankruptcies, and loss in revenue if they abide by the single-use restriction.  Plaintiff and Class members are thus faced with a Hobson's choice: either (1) violate CDC and medical board requirements and safety standards, and use single-use vials of Botox® Cosmetic vials for multiple patients and risk sanctions and malpractice claims, or (2) suffer financial harm from their significantly reduced revenue on the sale of Botox® Cosmetic treatments.  *See* Exh. G.

115.   Plaintiff devoted substantial resources to developing a Botox® Cosmetic administration practice at several locations, in part, using Defendant's multi-use business plan and profit calculators.  Plaintiff incurred marketing, staffing, equipment, and various business startup and planning expenses.

116.   For example, Plaintiff estimates that his start up costs were in excess of $1 million.  The costs incurred included hiring staff (physicians and mid-level physicians assistants and nurse practitioners), marketing, advertising, inventory, promotional materials, and equipment for treatment stations and rooms.  Plaintiff's clinic sizes and costs approximated:

- Pueblo Medical Center: approximately 5000 sq. ft. and estimated costs in excess of $200,000 in rent and upgrades.

- Tropicana Medical Center: approximately 5000 sq. ft. and estimated costs (of $250,000.

- Anthem Trimcare: approximately 4400 sq. ft. at and estimated costs of $250,000

- Galleria: estimated purchase price of $60,000 for the site and $100,000 for miscellaneous expenses.

- Lone Mu: approximately 4000 sq. ft. and estimated costs of $200,000.

- Flamingo Trimcare: estimated costs of $60,000.

117.   When Plaintiff began to see the volume of patients necessary to justify these business expenses, he learned that his business model, promoted and supported by Defendant, was in violation of the single-use directive, CDC, and state medical board guidelines.  Plaintiff will never see a return on the vast majority of his business development investment.

118.   Plaintiff is aware of numerous other Class members who incurred substantially similar expenses while relying on Defendant's misrepresentations. Plaintiff is aware of Class members who have been forced to shut down their establishments as a result of purchasing the Product based on Defendant's representations regarding using one vial of Botox® Cosmetic multiple times and later failing to make a profit due to the vial's single-use directive.

119.   Plaintiff was forced to discard a substantial amount of the Product valued at thousands of dollars after being informed that the vials cannot be used for multiple procedures among several patients. To the extent that Plaintiff continued to purchase vials of the Product after learning of its single-use limitation, he did not do so voluntarily.  He was forced to do so to protect his investment in developing a practice based on the Product.  Defendant's fraudulent marketing scheme and unfair and unlawful business practices had locked Plaintiff into

29

THIRD AMENDED CLASS ACTION COMPLAINT

1    continuing to purchase the Product or give up entirely his cosmetic practice with

2    even greater loss of investment, revenue and profit.

3        120.   Plaintiff's reliance on Defendant's marketing which promoted the

4    multi-use of a single Botox vial had caused him to incur significant expenses to

5    startup and market his practice.  A significant portion of his patients and revenue

6    came from his ability to provide Botox® Cosmetic treatments at competitive

7    prices, and thus, both acquire and retain patients who wanted Botox® Cosmetic

8    treatments, along with other cosmetic treatments.

9        121.   After learning of the single-use restriction of Botox® Cosmetic vials,

10   Plaintiff was forced to continue to purchase Botox® Cosmetic and provide

11   treatments at a significant degradation in profits, and even at a loss, in order to

12   mitigate the loss he would suffer were he to discontinue offering Botox® Cosmetic

13   treatments at competitive prices.  Specifically, if Plaintiff discontinued offering

14   Botox® Cosmetic treatments or significantly increased the price of such

15   treatments, not only would he lose the capital investments and goodwill he had

16   created from marketing his Botox® Cosmetic practice, he would also lose the

17   continuing revenue from many patients who would go to other physicians for *all* of

18   their cosmetic treatments, not just Botox® Cosmetic treatments, and thus, also lose

19   a significant amount of the capital investments and goodwill of the entire medical

20   practice which he had built.  Indeed, Defendant, through its representatives, told

21   Plaintiff to "utilize Botox as a TOOL to its full potential to **cross-sell** other

22   products, services, surgeries within your practice."  (emphasis in original).  *See*

23   Exh. A.

24       122.   Defendant essentially has a monopoly on onabotulinumtoximA.[27]

25   Thus, Defendant has the power to impose overcharges on physicians who have

26   built Botox® Cosmetic practices because the physicians are locked into the

27

28   _____

[27] Although Dysport, was recently introduced in 2009 and is similar to Botox®
Cosmetic in that it also treats glabellar lines, the two products are still different.

30

THIRD AMENDED CLASS ACTION COMPLAINT

1  product as a result of Allergan's unfair and misleading business practices.

2  Defendant's marketing of Botox® Cosmetic to patients created a demand for the

3  Product.  In turn, Plaintiff and other physicians were locked into continual

4  purchased of the Product in order to maintain their relationships with their patients.

5       123.   Thus, Plaintiff's reliance on Defendant's misrepresentations during

6  the time period before Plaintiff learned that multi-use of Botox® Cosmetic vials

7  was prohibited is a direct and proximate cause of the economic losses he suffered

8  from his continued purchase of the Product after he learned of the single-use

9  restriction of Botox® Cosmetic vials.  Further, Defendant's continuing

10  misrepresentations to other physicians, and the pricing expectations Defendant's

11  misrepresentations have created in patients, are further direct and proximate causes

12  of Plaintiff's economic losses after learning of the single-use restriction of Botox

13  vials and abiding by such single-use restrictions.

14  ## CLASS ACTION ALLEGATIONS

15       124.   Plaintiff seeks relief in his individual capacity and seeks to represent a

16  class consisting of all others who are similarly situated.  Pursuant to Fed. R. Civ. P.

17  23, Plaintiff seeks certification of a class initially defined as follows:

18       **All direct purchasers of Botox® Cosmetic who purchased the Product**

19  **from Allergan and Allergan authorized distributors from 2002 to the present.**

20       125.   Excluded from the Class are Defendant and its subsidiaries and

21  affiliates, Defendant's executives, board members, legal counsel, and their

22  immediate families.

23       126.   Plaintiff reserves the right to amend or modify the Class definition

24  with greater specificity or further division into subclasses or limitation to particular

25  issues.

26       127.   Numerosity.  The potential members of the Class as defined are so

27  numerous that joinder of all members is unfeasible and not practicable.  While the

28  precise number of Class members has not been determined at this time, Plaintiff is

31

**THIRD AMENDED CLASS ACTION COMPLAINT**

1   informed and believes that Defendant, during the relevant time period, wrongfully

2   marketed the Product to hundreds of people, including medical professionals.

3   Defendant's records will provide information as to the number, location, and

4   identification of all Class members.

5       128.   <u>Commonality</u>.  There are questions of law and fact common to the

6   Class, which predominate over any questions affecting only individual Class

7   members.  These common questions of law and fact include, without limitation:

8           a.  Whether Defendant represented that a single vial of Botox® Cosmetic

9               could be used for multiple patients;

10          b.  Whether Defendant failed to disclose clearly and conspicuously

11              material facts, such as the dangers in using a single-use vial of

12              Botox® Cosmetic for multiple patients;

13          c.  Whether Defendant's representations and promotional programs were

14              untrue and/or misleading;

15          d.  Whether Defendant's packaging and pricing of the Product resulted in

16              overcharges to Plaintiff and Class members;

17          e.  Whether Defendant violated California Business and Professions

18              Code sections 17500, *et seq.*; and

19          f.  Whether Defendant violated California Business and Professions

20              Code sections 17200, *et seq.*

21      129.   <u>Typicality</u>.  The claims of the named Plaintiff are typical to the claims

22   of the Class.  Plaintiff and all Class members were exposed to uniform practices

23   and sustained damages arising out of and caused by Defendant's unlawful conduct.

24      130.   <u>Adequacy of Representation</u>.  Plaintiff will fairly and adequately

25   represent and protect the interests of the members of the Class.  Counsel

26   representing Plaintiff is competent and experienced in litigating class actions.

27      131.   <u>Superiority of Class Action</u>.  A class action is superior to other

28   available methods for the fair and efficient adjudication of this controversy since

32

THIRD AMENDED CLASS ACTION COMPLAINT

1   joinder of all the members of the Class is impracticable.  Furthermore, the

2   adjudication of this controversy through a class action will avoid the possibility of

3   inconsistent and potentially conflicting adjudication of the claims asserted herein.

4   There will be no difficulty in the management of this action as a class action.

5   ### FIRST CAUSE OF ACTION

6   *Violation of the False Advertising Law*

7   (*Cal. Bus. & Prof. Code § 17500*)

8   132.   Plaintiff, on behalf of himself and all others similarly situated, repeats

9   and re-alleges the foregoing paragraphs, inclusive, and incorporates the same as if

10  set forth herein at length.

11  133.   Defendant has engaged in false advertising within the meaning of

12  California Business and Professions Code sections 17500, *et seq.* based on the

13  conduct herein alleged.  As a result of Defendant's conduct, Plaintiff suffered

14  injury in fact and lost money or property.

15  134.   Defendant's representations and actions emanate from its

16  headquarters, which is based in this state, and were disseminated to the public in

17  California and other states through Defendant's agents, promotional events, and

18  sponsored training courses.

19  135.   Through its agents, marketing materials, promotional events, and

20  sponsored training courses, Defendant represented that one vial of the Product is

21  suitable for multiple patients and that a successful practice could be built on selling

22  the Product on a per unit basis to the public.  Defendant also failed to disclose

23  material facts, namely, the dangers and risks in using one vial of the Product for

24  multiple patients.

25  136.   Defendant knew or should have known that its representations that a

26  vial of the Product is suitable for multiple patients and its non-disclosures were

27  untrue or misleading.  Defendant made these representations and non-disclosures

28  with the intent to induce Plaintiff and Class members into purchasing the Product.

33

137.   Plaintiff relied on Defendant's representations and non-disclosures, These representations and non-disclosures played a significant part in influencing Plaintiff's decision to invest in the development of a cosmetic practice based on the Product and purchasing the Product.  Plaintiff suffered injury in fact and lost money and property as a result of the misconduct alleged herein.

138.   Pursuant to California Business and Professions Code section 17535, Plaintiff and Class members seek all relief available thereunder, including equitable relief, in the form of restitution or disgorgement, by Defendant for Botox® Cosmetic that Plaintiff and Class members could not use because of unlawful and unfair business practices, and/or disgorgement of all revenues, earnings, profits, Defendant's compensation and benefits which may have been obtained by Defendant as a result of such business acts or practices; and an injunction enjoining Defendant from its unlawful and unfair business activities as alleged herein.

## SECOND CAUSE OF ACTION

*Violation of the Unfair Competition Law*

(*Cal. Bus. & Prof. Code §§ 17200 et seq.*)

139.   Plaintiff, on behalf of himself and all others similarly situated, repeats and re-alleges the foregoing paragraphs, inclusive, and incorporates the same as if set forth herein at length.

140.   Defendant has engaged in unlawful, unfair, and fraudulent business acts within the meaning of California Business and Professions Code sections 17200, *et seq.* based on the conduct herein alleged.  As a result of Defendant's conduct, Plaintiff suffered injury in fact and lost money or property.

141.   Defendant's unlawful business practices include, but are not limited to:

a.   Promoting Botox® Cosmetic for use in an unsafe manner;

b.   Promoting Botox® Cosmetic contrary to its indications; and

1         c.   Promoting Botox® Cosmetic contrary to federal and state medical

2            requirements.

3     142.   Defendant's business practices are unlawful in that its conduct

4 constitutes a violation of the False Advertising Law (Cal. Bus. & Prof. Code, §§

5 17500 *et seq.*), violations of FDA Regulations prohibiting off-label marketing (see

6 21 C.F.R. §§, 201.100, 201.128, 202.1; 21 U.S.C. §§ 331 *et seq.*, 352 *et seq.*), and

7 violations of state and administrative regulations and requirements.

8     143.   Defendant's unfair business practices include, but are not limited to:

9         a.   Promoting Botox® Cosmetic for use in an unsafe manner;

10         b.   Promoting Botox® Cosmetic contrary to its indications;

11         c.   Promoting Botox® Cosmetic in a manner prohibited by the Center for

12            Disease Control, and thus, in a manner contrary to public policy;

13         d.   Promoting  Botox® Cosmetic in a manner prohibited by various state

14            medical agencies and medical boards, and thus, in a manner contrary

15            to public policy;

16         e.   Packaging Botox® Cosmetic in such a way that Plaintiff and Class

17            members could not concurrently administer it in the manner

18            advertised by Allergan representatives and comply with the single-use

19            directive;

20         f.   Packaging Botox® Cosmetic in such a way that results in overcharges

21            to Plaintiff and Class members; and

22         g.   Promoting a business model that required Plaintiff and Class members

23            to administer Botox® Cosmetic in a manner that was unsafe, contrary

24            to its indications, and contrary to CDC and state requirements.

25         h.   Locking-in Plaintiff and Class members to continued purchases of

26            Botox® Cosmetic.

27     144.   Defendant's business practices are unfair because they offend

28 established public policy against using a single-use vial on multiple patients.

THIRD AMENDED CLASS ACTION COMPLAINT

1   Defendant's practices are immoral, unethical, oppressive, unscrupulous and or

2   substantially injurious to Plaintiff and Class members.  There is no justification for

3   Defendant's conduct.  Any economic benefit to Defendant is outweighed by the

4   gravity of the consequences to the Public, such as the risk of contracting a disease,

5   and to Plaintiff and Class members because, among other things, Defendant's

6   conduct results in overcharges to physicians and sets them up for potential

7   sanctions from their state medical boards.

8   145.   Defendant's business practices are further unfair in that they violate

9   the established policy and spirit of the laws set forth in Paragraph 142.

10   146.   Defendant's unfair business practice caused Plaintiff substantial harm

11   in the amount of thousands of dollars invested in the development of a cosmetic

12   practice based on the Product and spent purchasing and subsequently discarding

13   the Product and thus, Defendant's unfair practice is not outweighed by any

14   countervailing benefit to Plaintiff or Class members.  Plaintiff could not have

15   reasonably avoided this harm while simultaneously complying with the Product's

16   single-use directive.

17   147.   Defendant's fraudulent business practices include, but are not limited

18   to:

19     a.  Promoting Botox® Cosmetic for unsafe uses;

20     b.  Promoting Botox® Cosmetic contrary to its indications;

21     c.  Providing profit calculators that based profits on a use of a single vial

22        on multiple people; and

23     d.  Failing to disclose and/or adequately disclose material information,

24        including the nature of the vials as single-use and not multi-use, and

25        the unprofitable nature of the Product

26     e.  Failing to disclose and/or adequately disclose the material information

27        that that practice of using a single vial of Botox® Cosmetic for

28        multiple patients promoted by Defendant was contrary to the

36

1    recommendations of the CDC, various state health agencies, and

2    various state medical boards.

3        148.   Defendant's business acts are fraudulent because Defendant's

4    represented business model, profit calculator, and other acts as alleged in detail,

5    *supra*, created in Plaintiff and Class members the expectation that the Product was

6    safe and suitable for multiple uses on multiple patients, contrary to the Product's

7    label.  Defendant failed to disclose the relevant information that its business model

8    was contrary to the Product's single-use directive.  Defendant's failure to disclose

9    this information was likely to deceive reasonable people and did deceive Plaintiff

10   and Class members into believing that one vial of Botox® Cosmetic was suitable

11   for multi-use.

12       149.   Defendant made the representations, *supra*, while knowing that using

13   a vial of the Product according to the label's single-use directive would not

14   adequately compensate Plaintiff and Class members for the investment Plaintiff

15   and Class members made in developing practices based on the Product and for the

16   money spent in purchasing the Product.

17       150.   In reliance on Defendant's representations, Plaintiff invested in

18   developing a cosmetic practice based on the Product and purchased the Product

19   with the belief that one vial could be used multiple times; he was subsequently

20   deprived of the ability to use all of the Botox® Cosmetic in each vial and suffered

21   actual and monetary injury by having to discard the unused Product, and losing

22   some or all of his investment in developing the practice.

23       151.   Plaintiff has standing to pursue this claim because he has suffered

24   injury in fact and loss of money and/or property as a result of the wrongful conduct

25   alleged herein.  Defendant's business acts and practices, as alleged herein, have

26   caused injury to Plaintiff, the Class, and the public.

27       152.   Pursuant to California Business and Professions Code section 17203,

28   Plaintiff and Class members seek all relief available thereunder including,

37

1  equitable relief, in the form of restitution or disgorgement, by Defendant for
2  Botox® Cosmetic that Plaintiff and Class members could not use because of
3  unlawful and unfair business practices, and/or disgorgement of all revenues,
4  earnings, profits, Defendant's compensation and benefits which may have been
5  obtained by Defendant as a result of such business acts or practices, and an
6  injunction enjoining Defendant from its unlawful and unfair business activities as
7  alleged herein.

8      153.   Pursuant to California Business and Professions Code section 17203,
9  Plaintiff and Class members seek all relief available thereunder, including
10  equitable relief, in the form of restitution or disgorgement, by Defendant for
11  Botox® Cosmetic that Plaintiff and Class members could not use because of
12  unlawful and unfair business practices, and/or disgorgement of all revenues,
13  earnings, profits, Defendant's compensation and benefits which may have been
14  obtained by Defendant as a result of such business acts or practices; and an
15  injunction enjoining Defendant from its unlawful and unfair business activities as
16  alleged herein.

17                          **PRAYER FOR RELIEF**

18      WHEREFORE, Plaintiff prays for himself and on behalf of a Class similarly
19  situated, against Defendant as follows:

20      1.     For an order certifying the proposed Class herein under Federal Rule
21  of Civil Procedure 23 and appointing Plaintiff, and his counsel to represent said
22  Class, under Federal Rule of Civil Procedure 23(g);

23      2.     For restitution, disgorgement and/or compensatory damages as
24  permitted by law in an amount to be determined at trial;

25      3.     For an order pursuant to California Business and Professions Code
26  sections 17200, *et seq.* and 17500, *et seq.,* enjoining, among other things,
27  Allergan's conduct in advertising Botox® Cosmetic contrary to its indications and
28  applicable laws, regulations, requirements and safety standards;

4.     For an order pursuant to California Business and Professions Code sections 17200, *et seq.*, and 17500, *et seq.* enjoining, among other things, the manner in which Allergan packages Botox® Cosmetic such as that it results in multiple use contrary to its indications and applicable laws, regulations, requirements and safety standards;

5.     For prejudgment and post judgment interest on all damages as is allowed by the laws of the State of California;

6.     A declaration that Allergan is financially responsible for notifying Class members of the pendency of this suit;

7.     An award providing for payment of reasonable costs of suit;

8.     An award for attorneys' fees; and

9.     For such other and further relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a jury trial for the Class on all claims so triable to a jury.

Respectfully Submitted,

DATED: October 19, 2010

**FINKELSTEIN THOMPSON LLP**

Tracy H. Tien
Rosemary M. Rivas
100 Bush Street, Suite #1450
San Francisco, CA 94104
Phone: (415) 398-8700
Fax: (415) 398-8704

Matthew J. Sill (pro hac vice)
James D. Sill (pro hac vice)
**SILL & MEDLEY**
14005 N. Eastern Ave.
Edmond, OK 73013
Phone:  (405) 509-6300
Fax:     (405) 509-6268

39

THIRD AMENDED CLASS ACTION COMPLAINT

1
2

E-mail:  matt.sill@sillmedleylaw.com
          jim.sill@sillmedleylaw.com

3
4
5
6
7

Tracy D. Rezvani (pro hac vice)
**FINKELSTEIN THOMPSON LLP**
1050 30th Street, N.W.
Washington, DC 20007
Phone: (202) 337-8000
Fax: (202) 337-8090
E-mail: trezvani@finkelsteinthompson.com

8
9
10
11
12
13
14

Michael L. Kelly
Behram V. Parekh
2361 Rosecrans Avenue, Fourth Floor
El Segundo, CA 90245
Phone: (310) 536-1000
Fax: (310) 536-1001
**KIRTLAND AND PACKARD LLP**
E-mail: mlk@KirtlandPackard.com
         bvp@KirtlandPackard.com

15

*Counsel for Plaintiff Ivan Goldsmith*

16
17
18
19
20
21
22
23
24
25
26
27
28

THIRD AMENDED CLASS ACTION COMPLAINT

## CERTIFICATE OF SERVICE

I, Julia Dito, declare as follows:

I am employed by Finkelstein Thompson, 100 Bush Street, Suite 1450, San Francisco, California 94104. I am over the age of eighteen years and am not a party to this action. On October 19, 2010, I served the following document(s):

### THIRD AMENDED CLASS ACTION COMPLAINT

| X | **BY U.S. MAIL:** I mailed the foregoing via first-class U.S. mail, postage prepaid, to the participants at the addresses listed below.

Robert F. Kethcart
**SNELL & WILMER LLP**
400 East Van Buren
Phoenix, AZ 85004

Brendan M. Ford
Ellen Lynn Darling
Daniel S. Rodman
**SNELL & WILMER LLP**
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed this 19th day of October 2010 at San Francisco, California.

*Julia Dito*
Julia Dito

# Exhibit A

**Tips for Success**

Always remember.......Focus on Building your REFERRAL Base and RETAINING your existing customer base (through #1 patient education, and #2 advanced optimal injection patient treatment outcomes.) Imagine every 1 patient as 100 patients (in word of mouth – positive or negative.)   If you currently have a large patient database, utilize this to your advantage, and utilize Botox as a TOOL to bring a patient in every 3-4 months, to establish a strong relationship with your patients through consistent, regular visits, to cross-sell (cross-educate) other products and services (ie: surgeries), and to increase patient referrals.

1. Make sure your telephone receptionist is trained on "telephone skills," and trained on how to answer questions about Botox and Fillers. (75-90% is telephone contact & first impression, and the receptionist has 15 seconds to make a positive or negative impression for your practice.) 68% of patients sited staff discourteousness for seeking care else where. Answer the phone by the 2nd ring; check back every 20-30 seconds to patients on hold.  Be skilled at credentialing the qualifications of the injector, be skilled and qualified to answer all questions (what it is, how is works, where it goes), be able to clearly verbalize the prices of each product, as well as how long each product lasts (under-promise and over-deliver). (Patients are savvy — reconstitute to package insert protocol standards, and sell by the unit vs. the area.)
2. Please inquire if you are interested in my emailing your practice the "telephone skills/telephone etiquette" power point presentations.
3. Play a pre-recorded "On-Hold" message advertising your aesthetics practice and treatments. (www.televox.com, greerm@televox.com, www.mjdcp.com/products/messages-on-hold , www.usadata.com, www.infousa.com, www.acculeads.com, comonhold@aol.com, www.commercialsonhold.com, )
4. Pro-Actively Dispel the Myths of Botox and Fillers – be able to answer "What it is, How is Works, and Where it Goes" for every product.  Pro-Actively answer questions about safety and the affects of long-term use (establish the educational foundation for every patient). The most common myths are: expressionless, frozen face, can't move your eyebrows, accumulation of botulism or toxins in the body, permanently alter the facial structure, won't look natural, will look like you've had "work done." Avoid words like paralyze or freeze, poison or toxin (utilize words like "relax" and "purified protein" – explain that Botox is processed into a purified protein – and is not a botulism. – Make the comparison to how Penicillin is a "purified" form of mold – an antibiotic that revolutionized medicine.) 69% of patients have safety concerns, and 39% of users still have safety concerns. (Patient Education is Key.)
5. Make sure your practice is listed on the www.botoxcosmetic.com and www.juvederm.com websites. To be listed your practice must first enroll in APP (Allergan Partner Privileges at www.allergannetwork.com, enter your account # as your username and password.)  (Need to purchase 10 vials of Botox, and 10 boxes of Juvederm to be on each website, respectively.)
6. Set aside specific Aesthetic Treatment Days (so patients can be seen in an organized, systematic, uniform way)– Set aside specific days to inject Botox and Fillers – Aesthetics Patients need to be able to book an appointment in a convenient timely manner (be able to offer an appointment within 48 hours of their phone call).
7. Aesthetics Patients don't like to be kept waiting in the waiting room (schedule your patients appropriately – remember "new" patients take longer to consult and treat.)
8. Make the Aesthetics environment peaceful, pleasing, neat, and organized.
9. Offer great bedside manner, and take time (20–30 minutes) with each "new" patient to properly assess their needs (create a "customized treatment plan" for every patient – and update this plan regularly as their interests may change from month to month.)

10. Always call <u>two days</u> prior to remind patients of their appointments (on cell phones and home phones).

11. Always <u>call patient after treatment</u> (within 48 hours) to check how they are doing.

12. <u>Collect Email Addresses from patients</u> – in order market by "<u>E-Blasts</u>"–promotional specials, and patient educational newsletters, and send treatment reminders. (Redi-Mail Direct Email Marketing – for assistance on setting up E-blasts – contact, Vince Stallone vstallone@redimail.com 973-808-4500, ext. 216) (also, www.televox.com, greerm@televox.com ).

13. <u>Only 3% of the 27 million patients</u> (who meet the aesthetic demographic of 35-55 yrs of age with a 55K income per year) are utilizing Botox. (Patient Education, dispelling the myths of Botox, will grow the aesthetics market as a whole, which will ultimately help your practice most.) Differentiating Botox from fillers is essential (<u>what it is, how it works, where it goes</u> – know each product and "the science" behind each product very well.)

14. Include a <u>Credentialing Bio</u> in the front insert of your <u>Brochure</u> describing your injection training.

15. Include <u>Before and After Pictures</u> in your <u>Brochure</u> of Treatments (a picture is worth a 1000 words.)

16. Include <u>Prices of Services in your Brochure</u> (<u>as an interchangeable insert.</u>) (Patients want to see Prices; otherwise, they feel "speculative" about the value for services/treatments they are receiving.) (Patients want to know how you reconstitute/dilute Botox, and patients prefer a Botox price by the unit.)

17. Print <u>a "refered by" empty, blank, white box on the back of every Brochure you have (especially on the brochures of your "menu of services")</u>—<u>and have printed "$25 Gift Card for Every Person You Refer."</u> This will allow the person to write in their name, and you can reward the person who has sent you the referral with a $25 gift card to use for any product/service in your practice. Turn your patients into your own personal "sales force" by incentivizing them to send you referrals. The $25 gift cards will also bring in the existing patients more often, and they will in-turn spend even more on products/services within your practice. They will also be more inclined to "tip" their injectors, aestheticians, laser techs more (which will keep your staff happy & motivated to offer optimal customer service to your patients.).

18. Have a solid referral program in place (<u>$25 Referral Gift</u> card specific to your practice– to encourage your existing patients to send you more referrals. This also show Customer Appreciation – it shows that you value their loyalty and their referrals – a win-win relationship.

19. Have a <u>Blank $ Amount "Gift Card"</u> set up in a stand directly at your cash <u>register/check out desk</u> – a gift card that your existing patients/clientele can purchase for gifts for their friends and family, to use within your practice.

20. Send out <u>Treatment Reminder Cards every 3 months</u> (Have patients fill out their name and address on the treatment reminder card, and keep these cards in a tickler file, to be mailed out every 3 months – similar to a dentist sending treatment reminders for dental cleanings. – also E-Blast treatment reminders by email.)

21. Always remember to have your receptionist <u>Re-Book your Botox or Filler patient's next appointment BEFORE they leave the office.</u> Always call, and send Treatment <u>Reminder Cards</u> to your Botox and Filler patients – consider adding a little incentive (perhaps offering $off one of the other services in your practice, or a $special for Botox, to get them coming back consistently every 3-4 months. 41% of patients who come back every 3-4 months for their Botox appointment will eventually purchase other services in your practice (this is called "conversion".) <u>Botox has a 98% patient Satisfaction Rate</u> – it is a great tool – to help build your practice, and build your conversion (cross-selling) business for other products, services, and surgeries in your practice.

22. Offer you patients "complimentary" re-applications of their make-up after their treatments with your exclusive make-up line that you sell within your practice. This will help patients "feel and experience" your make-up line; and help you sell more make-up. It is also a nice customer service gesture, to re-apply their make-up after their treatments.

21. If a patient **calls** to schedule a laser appointment, **while the patient is on the phone**, have the receptionist immediately pull up "last injection history" from the computer, and ask them if they want to re-book their Botox and Filler appointment for the same day as their laser treatment, or another day if they chose.

23. **Search your database for patients who have not yet returned for their Botox treatments in 3-4 months**, and send them treatment reminder cards, emails or phone calls. Consider rewarding a staff member with **$5 for every patient they re-book who actually follows through with a treatment** (generated from the staff member's phone call.)

24. Have your Allergan Rep run a "**Botox Retention/Return Rate Analysis**" Spreadsheet for your practice (do this regularly – so you can track and maintain your Botox retention/return rates.)

25. **Search your database for Botox patients who haven't tried fillers, and Filler Patients who haven't tried Botox**, and cross market to them by sending out promotional mailers, educational newsletters, etc. Consider rewarding a staff member with **$5 for every patient they book who actually follows through with a new "conversion" treatment.**

26. Have a "**Botox-Bounce-Back Promotion**"- Consider offering patients an incentive—for example, $25-50 off their Botox if they pre-book their Botox appointments every 3-4 months, and actually keep their appointments and get treated.

27. Consider offering patients $25-50 off each Botox treatment – if they keep their Botox appointments, and do not cancel or change their appointments, and actually follow through with treatment.

28. Also consider offering to pre-book patients' Botox appointments for the **entire year**. Perhaps consider tying in an incentive for patients – for those patients willing pre-book or even pre-pay for their Botox treatments/appointments for the entire year.

29. **Utilize Botox as a TOOL** to bring patients back to your office every 3-4 months – utilize Botox as a TOOL to its full potential to **cross-sell** other products, services, surgeries within your practice. Botox is a "**business-builder**." Botox has "drawing power." It has a 98% customer satisfaction rate, and it is a "household" name. $55 million in DTC ads are put behind the Botox per year, and $16 million behind Juvederm per year, **to drive patients into your practice**, and create more educated aesthetics patients – more educated patients who are more knowledgeable on the safety, efficacy, and benefits of each product.

30. Have Patients fill out an **Aesthetic Cosmetic Interest Questionnaire** to identify their needs, and follow up with having them fill out a customized, **Personalized Aesthetic Treatment Plan** for the year (breaking down their "personalized treatment plan" into a monthly plan for the entire year). **Have the questionnaire with a pencil – laying on top of the coverlet/gown for patients to fill out after they change** – this will help laser techs and aestheticians engage the patient about their interests in products and treatments – it will serve as a door opener for conversation and patient education. **Have patients fill out this questionnaire every 3-4 months**; their needs may change from quarter to quarter – perhaps they will be interested in a treatment/procedure next quarter, that they weren't interested in prior – this will help uncover their needs, and help you address their needs.

31. **Offer Patients Two Separate Treatment Plans to chose from: 1. Correction, and/or 2. "Total Correction"** – Give Patients the prices and treatment suggestions for each plan – and let the patient decide on which personalized treatment plan they want to

purchase or eventually "graduate" to. Sell the idea of <u>"Total Facial Enhancement or Total Facial Rejuvenation."</u>

32. Aesthetically minded patients want to be educated, and they want solutions to meet their individual preventative skin care needs. <u>Set your practice apart – as giving the best education to each and every patient</u> (get your entire staff involved in this education process.) This will build credibility with your patients.

33. <u>Consider rewarding Aestheticians and Laser techs for educating patients and booking Botox and Filler Patients</u> who actually follow through with an actual treatment –for those Laser or Aesthetics patients who have not tried either Botox or Filler before.

34. <u>Incentivize your Staff to Pro-Actively Educate patients and Cross-Sell (Cross-Educate) in some way, shape or form – this will grow your business, and create a Positive Environment FOCUSED on education, and Optimal Patient Outcomes/Satisfaction</u> – establish this foundation, and success will follow.

35. If you have an aesthetician or laser tech on staff....consider setting up your <u>credit card machine to have a "tip line" printed on the receipt.</u> Sometimes patients may forget to tip their aestheticians, laser techs or Injector simply because they are in a "medical setting" and forget to tip. This "tip line" on the credit card receipt can be a great tool to increase optimal customer service and patient care.

36. Hang <u>"Before and After" pictures on the backs of every door (or the side wall) of every treatment and exam room with a small mirror hanging underneath</u> – when patients look into the mirror they will "visualize" their potential "after picture." (also put before and after pictures, and brochures in the restrooms.)

37. Place <u>Botox and Juvederm Patient Brochures and Posters in every Treatment room.</u> (Always have treatment brochures in EVERY exam room at all times; put your "practice stamp" on every brochure – call 800-377-7790 or 714-246-6484 at anytime to have Botox and Juvederm patient brochures mailed to you.

38. Play a <u>Botox and Juvederm DVD Loop</u> on the TV in the waiting room, and at Open Houses or patient education seminars.

39. Coordinate your messaging and marketing to your patients with the <u>Allergan DTC campaigns:</u> Lose your Elevens, Keep the Wisdom Lose the Lines, Express Yourself, There is a Place for Parenthesis but not on your Face, Look as Good as You Feel, Everyone will Notice but No-one will Know.

40. **Relax** (Botox), **Fill** (Juvederm Ultra), and **Volumize** (Juvederm Ultra Plus). Juvederm Ultra Plus is 20% thicker than Juvederm Ultra. For optimal treatment outcomes, utilize both Juvederm Ultra and Juvederm Ultra Plus to address the specific treatment outcomes desired by your patients.

41. Send out a <u>monthly or quarterly Educational Newsletter</u> to Patients. <u>Hand the Monthly or Quarterly Newsletter to patients to read while they are in the waiting room</u> and send a copy home with them to read. (Get your staff involved, your aestheticians, laser techs, injectors – have each person contribute a segment to each month's newsletter – this will help personalize and credential each staff member.) Address topics such as Daily Home Preventative Skin Care Regimens, the importance of a daily manual exfoliant, the lifecycle of the epithelial skin cell and importance of cellular turnover, The role of Hyaluronate in our bodies/skin/joints and depletion with age, Importance of Hydration, Descriptions of the various skin-types (talk about overproductive oil glands caused by "dehydration" which is quite prevalent in the desert climate), Hyper-pigmentation, Melasma (caused by pregnancy and/or Abrupt Hormonal Fluctuation), Cholasma, the best "types" of  Sun-Screen Protection UVA/UVB protection/parasol 1789/titanium dioxide, Importance of Antioxidants to protect against UV Rays/Environmental Pollution/Cigarette Smoke/free radical damage, how to prevent telangiectasia (broken facial capillaries), Explain the purpose of each ingredient in a Daily Skincare line, Explain the importance of pharmaceutical/medical grade skincare line vs. a department store line, Explanation of the protocol and importance of regular Chemical Peels, Explaining the differences between light, medium and deep chemical peels, Explain the Ingredients and purpose of glycolic, salicylic, lactic, trichloroacetic Chemical

Peels and appropriate skin types for each, Explanation of Enzyme Peels, Explanation of Retinoic Acid, Explanation of Laser treatments, Explanation of Botox (topics such as dispelling the myths of Botox, Botox reconstitution technique, Botox pricing by unit vs. area, Danger of illegal Neuro-toxins), Explanation of Fillers, Explanation of the preventative science behind Hyaluronate gel – not just filling but working on a "cellular level", Discussion about the science behind the "duration" of fillers, Explaining ingredients in each filler– topics such as "what's in a syringe" – explaining "relevant" product that lasts vs. the anticipatory volume loss of "needle-extrusion-additives," Explanation of the science behind enzymatic breakdown and the body's metabolism of fillers, Discussion on combination/multiple filler usage for various purposes, Explanation of where fillers are injected and why (deep dermis, reticular layer, etc.), Discuss the importance of Advanced Injection Technique. —— Patients are so overwhelmed, so confused –they are starving for education – any aesthetically minded patient who finds his/her way into your practice truly desires knowledge about preventative skin care. Set your practice apart – and offer this knowledge. <u>Always explain, 1. what it is, 2. how it works, 3. where it goes for every product and treatment offered in your practice.</u>

42. Consider hosting a <u>weekly or monthly Patient Educational Seminar</u> at your office or reach out to the community — make this an open forum for patients to learn and ask questions.

43. 72% of **Botox users hear about Botox through a friend** (Patient Education is Key – the "friend"should have the foundational knowledge and proper education to pass on the "proper" information about Botox and Fillers.

26. If your Practice has great **"drive-by-visibility" – capitalize on this advantage –** hang vinyl banners advertising a price per unit that has "drawing power," and set up A Frame Stand & Signs near the road, advertising a price per unit – for drive by traffic to see.

27. Purchase Zip code lists to market and to recruit new customers--there is a 3% return rate on investment rate. (<u>www.USDataCorp.net/MailingLists</u>, <u>www.infousa.com</u>, <u>www.usadata.com</u>, www.mailing-lists-direct.com), and Dunn Hill International.

44. Advertise on the radio, and/or TV. (especially for Patient Educational Seminars held weekly "on Preventative Skin Care," etc...) Patients are starving for information – and proper education (to diminish "confusion") on preventative skincare.

45. Advertise in country clubs or community center newsletters, and rent display booths on their "vendor days.

46. Partner with Aesthetic/Cosmetology Schools, Salon Stylists, and Make-up Artists.

47. Partner with Hotel Resort Spa Directors – for local resident referrals.

48. Offer special "discount cards" for hotel employees, hotel aestheticians, cocktail waitresses, aesthetic students/teachers, etc – in addition to offering them your brochure (with the $25 Referral Ad printed on your brochure). This will surely bring in more referrals.

49. Rent Display booths, and advertise in Fitness Centers.

50. Place your brochures (with the $25 Referral Ad printed on your Brochure) with business owners (<u>partner with anyone with a database of potential patients</u>). Boutiques, Yoga Studios, Make-up Artists, etc.

51. Do as many <u>promo/event mailers</u> as you possibly can, and host as many "injection days, weeks or months" events, seasonal open houses/patient educational seminars as you possibly can.

52. Do <u>"live injections demos"</u> for patients to observe at any and all open houses/patient education events.

53. <u>Allow your staff, patient consultants, and injectors to "experience" the products for themselves. If they personally experience Botox and Juvederm, they can truly more effectively communicate their experiences with patients – and in-turn, sell more product.</u> Personal "testimonials" are an incredible TOOL to grow your business, and instill "confidence" within your patients from "experienced" staff member about the

products and services offered within your practice. You will have a "happier staff" who is willing to SELL more for you. Botox and Filler injections for your staff perhaps can be tied into some sort of "incentivizing program" for your staff – encouraging your ENTIRE staff to Sell and Educate. (Anyone from the receptionist who answers the phones, to each and every aesthetic team member.) Consider, setting aside a portion of "product rebates" to use for an incentive program for your staff members. (The #1 Botox Accounts in the Nation do this very effectively, and have utilized a solid Staff Incentive Program to build their Practices.)

54. A strong Staff Incentive Program, a Strong Patient Referral Program with $25 off for every patient sent, Patient Education, and Advanced Optimal Injection Outcomes – will and has effectively built successful aesthetics practices across the nation.

55. Always Have Patients "bring a friend" to each and every event or open house – and reward them for bringing their friends with referral gift cards to utilize on future visits within your practice.

56. Utilize the resources of your Allergan Rep – to support you with printing for your event mailers, catering for your events/patients educational seminars, and to provide any Botox/Juvederm give-a-aways or goodie bags for these events. I am also happy to print up any mailers, invitations, or posters that you may need for these events.

57. Remember to plan ahead, and maximize your promotional efforts, and strategically coordinating your marketing efforts with the peak seasonal time frames throughout the year— have your printing, promos, and open houses strategically set in place. Remember, ideally, all event mailers, and seasonal mailers should go out 3 weeks prior to the event (to get a maximum return and rsvps.)

58. Consider creating a Quarterly Business Plan—a clearly devised marketing strategy set in place for the ENTIRE year; correlating with the 4 quarters of the year (Encourage your staff to attend these planned events to Promote your Practice as a TEAM – "Together, Everyone Achieves More.) ....1st Q (Christmas, New Years, and Valentines day), 2nd Q (Spring, Mother's Day, Memorial Day Weekend, Graduations, Weddings, Preparing fore Summer vacations), 3rd Q (Father's Day, Back to School Specials, Summer Vacations, Class Reunions), 4th Q (Labor Day, Fall Specials "Fall into Beauty," Halloween "Scare away the lines," Thanksgiving, Winter Specials.) And most importantly, always have a way to "measure" your success – measure the return on your investment.

59. Strive to Reach Platinum Rebate Status with Allergan, which will qualify your practice for the Botox Benefits $25 off card (a $25 off card to be used exclusively in your practice for up to 3 visits of $75 for the year.) This is a great resource to offer your patients to keep them coming back every 3 months to cross sell other products and services. Your Juvederm Purchases can greatly contribute to your achieving this Platinum Status to qualify your practice for the Botox Benefits $25 off card. (The entire Allergan Aesthetics portfolio contributes toward achieving a Platinum Status – each Natrelle Implant, each $500 purchase of a combination of PrevageMd/Vivite/MdForte Skin Care, each vial of Botox, and each box of Juvederm.)

60. Promote Juvederm as the "Next Generation" Smooth Dermal Filler (as a product "made from the same company who makes of Botox" to help build credibility with patients.) Juvederm has captured 45% market share of the filler market after only one year since its FDA approval (Juvederm is Highly Patient Satisfying – it is long lasting, and has a smooth and natural feel.) Juvederm can be injected to full optimal fill from day one – no volume loss is seen from dissipation of "needle-extrusion-additives" as is seen with other dermal filler products.

61. Consider promoting Juvederm as the Next Generation Smooth Hyaluronate Dermal Filler that last 2 times longer than the older fillers on the market, for the same price or even priced less. (This will surely gain the attention of patients, and make patients feel they are getting the Most for their Money – and giving patients a long term "treatment plan" they can stick with and afford.) The highly interwoven Hyaluronate

Cross-linkages (Hylacross technology) make Juvederm last longer, and makes Juvederm more resistance to enzymatic breakdown and metabolism.

62. Statistical National average show that <u>only 21% of the targeted aesthetic demographic get treated with "BOTH" Botox and Fillers</u> in aesthetic practices nationwide--- there is quite an opportunity to increase your filler conversion business (& it begins with <u>patient education "what it is, how it works, where it goes", and on preventative skin care in general.</u>) <u>Educating patients</u> on "preventative skin care" and getting them truly excited and passionate about preventative skin care <u>is essential.</u>

63. <u>Educate patients on how the hyaluronic gel fillers work on a "cellular level."</u> This will get them excited about preventative skin care.  Educating patients on how hyaluronic gel fillers not only help with plumping and filling fine lines, wrinkles and folds, but also due to the very "nature" of the plant derived product (which "mimics" the bodies own natural Hyaluronate"), hyaluronate gel fillers help hydrate, moisturize, bind and lock in the moisture in the skin– aiding in preventative skin care process. <u>One single molecule of hyaluronate can bind 1000x's it's weight in water,</u> and as we age, our skin and bodies lose the natural levels of this natural hyaluronate; hence the need to replenish hyaluronate for preventative skin care.  Juvederm Hyaluronate Gel Dermal Filler – The "Next Generation," Smooth Hyaluronate Gel Dermal Filler–now has an official <u>FDA approval to last out to one year</u> (touch-ups at 8-9 months) – <u>utilize this data to market and sell more product to your patients.</u>.  According to national statistics, the one year duration, with touch ups at 8-9 months, is an <u>optimal time</u> frame for a dermal filler, assuring <u>optimal patient satisfaction</u> – <u>patients feel they are getting the "most value" for the money that they are spending; and this will keep patients "coming back."</u>

# Exhibit B

≀NIDUS‹      XPress Card Selections

1 )



2 )



# Exhibit C

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25 | | | | | | | | | | | | | | |
| 26 | | | **Give Yourself a Gift this Valentine's** | | | | | | | | | | | |
| 27 | | | * Save $100* | | | | | | | | | | | |
| 28 | | | A Special Gift Just For You. | | | | | | | | | | | |
| 29 | | | Save $100 when you purchase 1 syringe of Juvederm™ and 20 units of BOTOX® Cosmetic. | | | | | | (404) 555-1212 www.drlockgood.com | | Dr. Lockgood and Allergan Medical are offering a Fall Promotion on Juvederm Injectable gel from October 15th through November 15th! | | | |
| 30 | | | Valid only until March 1, 2008. Call today to schedule your appointment! (714-XXX-XXXX | | | | | | | | Buy one syringe of Juvederm Ultra Plus, get the second one at half price! This is a savings of over $250!!! | | | |
| 31 | | | | | | | | | | | You will also receive a complimentary jar of Allergan physician-strength topical antioxidant, Prevage MD — during treatment ($145 below). | | | |
| 32 | | | TREAT YOURSELF! | | | | | | | | Call to reserve your appointment today! | | | |
| 33 | Carolbymoshkavia avarage | | | | | | | | | | | | | |
| 34 | | | | | | | Front of Card | | October 15th – November 15th 2007 | | Special Offer | | | |
| 35 | | | | | | | | | | | TREAT YOURSELF! | | | |
| 36 | | | | | | | | | | | | | | |
| 37 | Overview: | Save $100 when you purchase 1 syringe of Juvederm and | | | | | | | | | | | | |
| 38 | | 20U of BTX-C (For appropriate patients) | | | | | | | | | | | | |
| 39 | | | | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | |
| 41 | | | 5. Syringe Offer | | | | | | | | 6. Holiday Offer | | | |
| 42 | ALLERGAN COSMETICS | BOTOX ALLERGAN | | | | | | | BOTOX | | BOTOX ALLERGAN | | | |
| 43 | | | | | | | | | | | | | | |
| 44 | | | | | | | | | | | | | | |
| 45 | | | | | | | | | | | | | | |

# Exhibit D

From:           Damore_Tina
Sent:           Monday, August 04, 2008 12:24 AM
To:             Damore_Tina
Subject:        Interesting – Calculators for your Injectable Business
Attachments:    Marketing – Botox Calculator and Business Plan Worksheet.xls; Marketing Juvederm
                Calculator and Business Plan Worksheet.xls; Marketing – Ideas and Goals for 2008.doc

I thought these may be of interest to you (?)   Click on the Attachment – and click on "Disable macros" to enter view the calculator tool, and to customize your numbers.

Here are some interesting calculator tools – to project profits on your injectable business in your practice -- you can enter in your own #'s, and see your personalized projections regarding your injectable business.  (It's interesting to see how the calculator can vary by increasing patient visits each week – increasing patient returns and referrals.)

Let me know if I can help out in the funding toward printing any mailers, catering open houses/patient events, etc.

Best Regards,

Tina Damoré
Allergan Facial Aesthetics
South West Las Vegas/Northern Arizona
Email:   damore_tina@allergan.com
Cell:   702-271-7585
Fax:   702-446-0342
To Order Botox, Juvederm Ultra or Ultra Plus, please call 800-377-7790 or 800-44-BOTOX
To Order Any Product Patient Literature Brochures, please call 800-377-7790
For Any Medically Related Product Questions, please call 866-269-4468

- Your ESTIMATED PROFIT for the remainder of 2008 would be:

$100,446.

one vial = $375

estimated profit* to your practice

***Botox™Cosmetic procedures are estimated, based on an average of 50 Units per Patient

*ESTIMATED PROFIT = (TOTAL REVENUE - cost of BOTOX)). Patients price per unit in 2008 - $9

# Exhibit E

STRICTLY CONFIDENTIAL  INTERNAL DOCUMENT

## Botox® Cosmetic Information

How many monthly Botox appointments do you see?

On Average how often do patients return for BOTOX®? (months between visits)

Would you be interested in your Allergan Rep performing a Retention Analysis to calculate your Botox Return Rate?

How do you dilute your BOTOX® Cosmetic?     # of Saline cc's per vial:

| Do you reconstitute/dilute with preserved or NON-preserved saline? | Preserved / Non-Preserved |
|---|---|

What type of syringe & needle gauge do you use to inject BOTOX?

Who injects BOTOX® Cosmetic in your office?

Did you price by the:     ☐Area     ☐Unit     ☐Syringe     ☐mL/cc     ☐Other _____

| What had been your average BOTOX® Cosmetic price **per unit**?(past/ present) | Yes or No |
|---|---|
| Do you track your injection points and amounts on a treatment record? | Yes or No |
| How soon is your first available appointment slot for a BOTOX® patient? | Yes or No |
| Are you available to see Botox patients every day of the week? | Yes or No |
| Time spent with a BOTOX® patient?  (New / Established) | Yes or No |
| Do you schedule next Botox treatment before patient departs office? | Yes or No |
| Do you take BEFORE & AFTER photos for all **NEW** BOTOX® patients? | Yes or No |

## Soft Tissue Filler Information

How many monthly Filler appointments do you see?

| Do you schedule Filler follow-ups before patient departs the office? | / |
|---|---|
| Time spent with a FILLER patient?  (New / Established) | Yes or No |
| Do you take BEFORE & AFTER photos for all **NEW** Filler patients? | Yes or No |

What fillers do you currently inject, please circle all that apply?

JUVEDERM Ultra   JUVEDERM Ultra Plus   RESTYLANE   PERLANE   RADIESSE   SCULPTRA
ZYDERM   ZYPLAST   COSMODERM   COSMOPLAST   CAPTIQUE   HYLAFORM
OTHER:

What is your charge (cost/per syringe) for each dermal filler that you offer in your practice?

Is the new Juvederm Dermal Filler listed in your actual Practice Brochure/Menu of Services Brochure?

STRICTLY CONFIDENTIAL  INTERNAL DOCUMENT

# Exhibit F

| | |
|---|---|
| **From:** | Damore_Tina |
| **Sent:** | Sunday, November 23, 2008 08:58 PM |
| **To:** | Ivan Goldsmith |
| **Subject:** | RE: hey dr. goldsmith (can you attend this program??) |
| **Attachments:** | Tina's Zip Codes.xls |

Ok - .sounds good

For getting your 3 providers some injector training - I definitely want to help you ---
unfortunately I as a rep have no idea of how to inject (: but I can definitely help in providing
product for your provider's classes.

I'm not sure --- but I don't think allergan has any Strata med CME injection courses coming up in
vegas for a while?? - unless you see something on www.aesthetichealthdimensions.com - (strata med
866-736-7633) ?? -that is the CME company that allergan donates money to for injector trainings.

A few times per year, the Strata Med courses are in vegas - but other classes may be nearby in
California or Arizona (if your providers are willing to travel) - small group classes (5 per class)
are free/complimentary.  One on one training (individual training) is $500 each student vs. the
$2500 that the organization normally charges.  Students must bring botox and juvederm, and a model
to the class - but I'll provide the product for you guys from my supplies, if your providers find a
class they are interested in registering for.

The CME courses are usually more beneficial for students vs. the "round-table dinner/injector
trainings" that the allergan sponsors or pays speakers to do directly.  The CME courses are able to
teach all techniques (outside of the FDA approved glabellar for botox and NLF's for Juvederm) -
whereas the allergan directly paid instructors (at these dinner programs) have to stay on label
(glabellar and NLF's).

Jason (my manager) said he has a little $$ left in his budget to sponsor one more juvederm
speaker/training meeting in vegas prior to the end of the year (sometime in December) - We usually
do 2 or 3 of these types of meetings per year - if this is the case, each rep will be allowed to
invite one attendee - the attendee for this program however will be given 2 free boxes of juvederm
to use at the class, but must purchase 5 boxes from the company to enroll in the class.  (and the
class will be Nasal Labial fold training only - all "on label" training…..so I'm not sure if this
would be helpful or "worth it" for you guys or not??)  If so, I'll save you a spot for this one too
(just let me know - otherwise, I have to reserve the spot for another student.) - since you have 3
providers, and this class will only have one spot, it may not be something that you'd be interested
in - but if so, just let me know…and I'd be happy to save this spot for you as well.  And I'll
offset the 3 extra juvederm that allergan requires the attendee to purchase to enroll/register for
this "round table" with my samples too.


Also……if Francesca Reese (the injector Ali is hiring) is willing to share some of her techniques
with your 3 new providers, that may be a nice idea for you --- she would be a great instructor.
She is very, very experienced.  I used to call on her when she was at MAYA - and Ali raves about
her.   Let me know - and I'll try to get some botox and juvederm samples over to you for your
providers to train with Francesca.   That is probably the best way to go for your providers to learn
the most.

Michelle Maisto (is the allergan rep for your galleria office on  sunset and whitney ranch in 89074)
- so I'll let michelle know I'm sending you some samples.

I am the rep for you other offices - in anthem and west trop. (I've attached all the zip codes I am
responsible for -I'm not sure who the rep would be for your centennial office - what is the zip code
of that office? I will let you know.)

There are 3 allergan reps - michelle maisto, Kristine gougeon, and me….amongst the 3 of us,~we'll
make sure we take care of you guys.

(:

Have fun in florida.


tina

From: Ivan Goldsmith [mailto:IGoldsmith@ihnv.com]
Sent: Saturday, November 22, 2008 6:31 PM
To: Damore_Tina
Subject: RE: hey dr. goldsmith (can you attend this program??)

i can any other time, because going to florida for a bat mitzvah. actually very flattered that you
asked. how bout we do a dinner together sometime in december to repair our relationship. i have
like 3 new providers starting in the clinics. have this guy dr. eric miller (single?) that needs to
learn botox too. really want to help get botox in a major way at galleria. i need to get some
promotion there asap! tropicana runs on auto-pilot with denise, but she is out of town alot.

                                                                                    ivan


From: Damore_Tina [mailto:Damore_Tina@Allergan.com]
Sent: Saturday, November 22, 2008 2:57 PM
To: Ivan Goldsmith
Subject: hey dr. goldsmith (can you attend this program??)
Hey dr. goldsmith,


There is a special dinner program at a restaurant called Tableau at the WYNN casino, at 6:30pm on
Friday December 5th sponsored by allergan.

Each rep in vegas is allowed to invite one person - so, unfortunately, I can only invite one person
(can you make it?)


The speaker is from San Diego (Dr. Moriadi - I think that's how to spell his name) - and he is going
to share all his practice implementation strategies - and what has made his practice successful
(he's a diamond account).

I wanted to invite you first -

 if you can't make it, no worries.

But let me know either way.


Best Regards

Tina

# Exhibit G

**To:** ivan[igoldsmith@ihnv.com];
**Subject:** Fwd: Complimentary Botox Staff Vials (from Tina)
**Sent:** Tue 5/13/2008 6:34:18 PM
**From:** Jill Oliver

----- Forwarded Message -----
From: Jgarciamd@aol.com
To: "Damore Tina" <Damore_Tina@Allergan.com>
Cc: DRMOMM@aol.com, deb@weilandgroup.com, jlance@accentmedspa.com, drrobtoledo@yahoo.com, "lea spiegel" <lea_spiegel@yahoo.com>, facesrx@gmail.com, shamu1103@cox.net, sandie@lvcosmeticsurgery.com, jgoldsmith@ihnv.com, denisesantoli@cox.net, jillymed@embarqmail.com, makai7@cox.net, cindy@surgispa.net, anilpatelmd@yahoo.com, "med spadoc" <med_spadoc@yahoo.com>, radiancemedspa@aol.com, sdelangis@cox.net, Ltovar@puremedspa.com, sairuko@yahoo.com, "mcps laura" <mcps_laura@yahoo.com>, naomi@arianasurgery.com, Carmen954@aol.com, Michelle6888@aol.com
Sent: Tuesday, May 13, 2008 6:33:06 AM (GMT-0800) America/Tijuana
Subject: Re: Complimentary Botox Staff Vials (from Tina)

does this mean we will get a bottle of Botox Cosmetic for each individual employee as the bottle is labeled single use single patient and the sharing of a single vial between multiple patients is likely a health department violation and could potentially end up in one losing their business and or medical license?

Julio L Garcia, MD FACS
This message and any files transmitted with it are intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If your are not the intended addressee, nor authorized to receive for the intended addressee, your are hereby notified that you may not use, copy, disclose or distribute to anyone this message or any information contained in or with this message. If you have received this message in error, please advise me immediately by reply email and delete this message.

Wondering what's for Dinner Tonight? Get new twists on family favorites at AOL Food.

# EXHIBIT H

**From:** Damore_Tina
**Sent:** Friday, May 16, 2008 12:41 AM
**To:** Damore_Tina
**Subject:** Botox 50 unit available to order on Monday, May 19th

Hey there,

Hope you are well.

Just wanted to let you know…I received confirmation that the 50 unit Botox vial will be available to order on Monday, May 19th.  You can call 800-377-7790 to place your orders on Monday morning, May 19th.  (If you are ordering the 50 unit vial…it was suggested that you clarify with the order desk at the time of your call, that you specifically want the 50 unit vial - to be assured there are no mistakes and that the order desks ships out the 50 unit per your request.)

Only 19,000 vials are available in this first production (it is being shipped from Ireland)….A second production will most likely be available from Ireland in 1-2 months.

Vegas customers are able to place orders two days prior to the availability for the rest of the nation (It will be available to the rest of the nation for orders on Wednesday, May 21st ).

If you would like to purchase the 50 unit vial….it has been suggested that customers order an "ample" amount for their practice (prior to available for the rest of the nation)…..as we are unsure on the exact dates when the next production from Ireland will be completed and available once again…Allergan is trying to manufacture as fast as possible…but after this first shipment received on Monday of 19,000 vials -- it may be 1-2 months before our order center receives the next shipment of 50 unit vials.

Just wanted to let everyone know on the dates.

Thanks for everything.  Please let me know if I can help you with anything at anytime..

Very Best Regards,

Tina Damore
Business Development Manager
Allergan Facial Aesthetics
South West Las Vegas/Northern Arizona
Email:  damore_tina@allergan.com
Cell:  702-271-7585
Fax:  702-446-0342
To Order Botox, Juvederm Ultra or Ultra Plus, please call 800-377-7790 or 800-44-BOTOX
To Order Any Product Patient Literature Brochures, please call 800-377-7790
For Any Medically Related Product Questions, please call 866-269-4468